LAWRENCE J. ALVES AND MYRA L. ALVES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4879–80.    Filed November 18, 1982.

*James G. Harrigan* and *Michael R. Moore*, for the petitioners.

*Kevin M. Bagley*, for the respondent.

## OPINION

SCOTT, *Judge*: Respondent determined deficiencies in petitioners' income tax for the calendar years 1974 and 1975 in the amounts of $12,335.53 and $3,822.77, respectively. By amendment to answer filed on September 24, 1980, respondent claimed an increased deficiency for the calendar year 1975 in the amount of $8,037.33, making a total claimed deficiency for that year of $11,860.10. By amendment to petition filed on June 15, 1981, petitioners raised a new issue claiming that the cost basis to be assigned to the stock sold during 1974 and 1975 was incorrectly stated in their returns as filed.

The issue for decision is whether petitioners realized ordinary income under the provisions of section 83[1] during the years 1974 and 1975 when some restricted stock was sold in an arm's-length transaction and when the restrictions on other restricted stock terminated.

All of the facts have been stipulated and are found accordingly.

Petitioners, husband and wife, who resided in La Jolla, Calif., at the time of the filing of the petition in this case, filed joint Federal income tax returns for the calendar years 1974 and 1975. Petitioners filed an amended Federal income tax return for the calendar year 1974.

In January 1970, Lawrence J. Alves (petitioner) was employed as the controller of Sylvania Semi-Conductor Division in Woburn, Mass. He was contacted during that month by Alvin B. Phillips, a former business associate of petitioner's, at Sylvania. Mr. Phillips told petitioner that he was in the process of starting a new company with the intent of manufacturing MOS-LSI integrated circuits. Mr. Phillips asked petitioner whether he would be interested in becoming connected with the new company. Petitioner told Mr. Phillips that he might be interested in the new venture, subject to learning more about the other persons who would be key management personnel and provided that a potential source of financing could be found for the new venture. Petitioner and Mr. Phillips spoke by telephone during the early months of 1970 on matters concerning the organization and financing of the proposed company. By April 1970, petitioner had decided to join the new company which, when it was formed, became known as General Digital Corp.

On April 23, 1970, General Digital Corp. was incorporated in the State of California for the primary purpose of engaging in the business of designing, developing, manufacturing, and marketing microelectronic circuits used as components in electronic equipment such as digital computers, computer terminals and peripheral equipment, data communications equipment, calculators, and appliance controls.

On May 5, 1970, General Digital Corp. (the name of the

---

[1]Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years here in issue.

corporation was changed in July 1971 to Western Digital Corp. and will hereinafter be referred to as the company) issued 90,000 shares of common stock to Alvin G. Phillips, president of the company, and 66,000 shares of common stock to G. H. Walker & Co. at a price of 10 cents per share. Such stock had a fair market value of 10 cents per share and was not subject to any restrictions. The issuance of stock to Mr. Phillips and G. H. Walker & Co. was in accordance with a resolution adopted at the first meeting of the board of directors of the company held on April 24, 1970. The minutes of the first meeting of the board of directors of the company, in addition to providing for the issuance of stock to Mr. Phillips and G. H. Walker & Co., stated in part as follows:

The Chairman stated that the next order of business was to consider the adoption of resolutions relating to obtaining a permit from the California Department of Corporations to issue shares of common stock ("Common Stock") of this corporation. The Chairman stated that discussions were being held with certain persons concerning their investment in this corporation through the purchase of 264,000 shares of Common Stock for cash or notes at a price of $.10 per share. In addition, it was deemed advisable in order to enable this corporation to obtain qualified employees or directors and to permit this corporation to compete with other companies for the services of qualified and competent employees and directors to issue 113,000 shares of Common Stock to Mr. Alvin B. Phillips to be held by Mr. Phillips in trust, to be transferred to persons who may become future employees or directors of this corporation in such amounts, prices and upon such conditions as may be prescribed by Mr. Phillips. It was decided that at the end of two years the trust would terminate and all shares remaining in the trust would be sold back to this corporation at $.10 per share. Upon motion duly made, seconded and unanimously approved, the following resolutions were adopted:

WHEREAS, this corporation is authorized to issue an aggregate of 1,000,000 of its common stock of the par value of $.10 per share; and

WHEREAS, it is deemed in the best interests of this corporation to issue not to exceed 264,000 shares of its common stock, $.10 par value to certain investors for a consideration of $.10 per share; and

WHEREAS, it is deemed in the best interest of this corporation to issue not to exceed 113,000 shares of its Common Stock, $.10 par value to its President, Alvin B. Phillips, to be held in trust by Mr. Phillips for transfer to persons who may become future employees or directors of this corporation;

Now, THEREFORE, BE IT RESOLVED, that any officer of this corporation be, and each is hereby authorized and directed to prepare or cause to be prepared, verified and filed on behalf of this corporation an application to the California Department of Corporations, including amendments and supplements thereto and applications for amended permits, for a permit authorizing this corporation to sell and issue not to exceed 264,000 shares of its Common Stock of the par value of $.10 per share for cash or notes at the

price of $.10 per share to any or all of the following named persons in the amounts set opposite their respective names:

| | |
|---|---|
| Joseph Baia | 54,000 shares |
| Henry D. Rodeen | 44,000 shares |
| H. Ward Gebhardt | 51,000 shares |
| Richard C. Sirrine | 51,000 shares |
| Lawrence J. Alves | 40,000 shares |
| Baden Parker | 16,000 shares |
| John F. Glade | 8,000 shares |

On May 22, 1970, petitioner joined the company as Vice President, Finance and Administration. On that date, the company issued to petitioner 40,000 shares of common stock at a price of 10 cents per share in accordance with the terms of an employment and stock purchase agreement dated May 22, 1970. This employment and stock purchase agreement provided in part as follows:

WHEREAS, the Company has been recently incorporated and is desirous of employing the Employee [petitioner] in an executive capacity; and

WHEREAS, in order to raise capital for the Company's initial operations while at the same time providing the Employee with an additional interest in the Company, the Company also desires to sell to the Employee Common Stock of the Company at the original subscription price of $.10 per share; and

WHEREAS, the Employee desires to serve the Company in an executive capacity and to acquire Common Stock of the Company:

Now, THEREFORE, the parties mutually agree as follows:

1. The Company agrees to employ the Employee and the Employee hereby agrees to serve in the employ of the Company in an executive capacity with the title of Vice President, Finance & Administration * * *

\* \* \* \* \* \* \*

3. As compensation for the services to be rendered by the Employee hereunder, the Company hereby agrees to pay or cause to be paid to the Employee, and the Employee agrees to accept as full compensation (a) a salary at the rate of Twenty-Thousand ($20,000.00) Dollars per annum, payable semi-monthly, and (b) such additional amounts, if any, as the Board of Directors may from time to time determine.

\* \* \* \* \* \* \*

10. The Company hereby agrees to issue and sell to the Employee, and the Employee hereby agrees to purchase from the Company, 40,000 shares of Common Stock, par value $.10 per share, of the Company (such 40,000 shares of Common Stock being hereinafter referred to as the "Shares") for a purchase price of $.10 per share, or an aggregate purchase price of $4,000.00. The Employee agrees to pay said purchase price on or before July 1, 1970. Upon payment in full of said purchase price the Company shall deliver to the Employee certificates representing the Shares.

11. The Employee agrees that, subject to the provisions of Section 14 hereof and the provisions of this Section 11, he will continue in the ownership of one-third of the Shares and will not sell, pledge or transfer any interest in such one-third of the Shares for a period of four years after the date of this Agreement (such one-third of the Shares being hereinafter referred to as the "Four-Year Shares"). In the event of a Termination (as hereinafter defined) prior to the expiration of said four-year period, the Company shall have an option exercisable within 60 days after the date of such Termination to purchase any or all of the Four-Year Shares for a purchase price of $.10 per share. For the purposes of this Agreement, a "Termination" shall mean the Employee's leaving of the employ of the Company for any reason, including without limitation any termination of employment under this Agreement by the Company pursuant to Section 4 hereof (except as hereinafter immediately noted), but specifically excluding (a) the death or permanent or indefinite mental or physical disability of the Employee attested by competent medical evidence, (b) the failure of the Company to continue employment on substantially the same terms, (c) termination by the Company without cause of the Employee's employment, and (d) termination by the Company of the Employee's employment more than three years after the date of this Agreement for cause other than gross neglect of duties or public conduct detrimental to the Employee's or the Company's reputation.

12. The Employee agrees that, subject to the provisions of Section 14 hereof and the provisions of this Section 12, he will continue in the ownership of an additional one-third of the Shares (in addition to the Four-Year Shares) and will not sell, pledge or transfer any interest in such additional one-third of the Shares for a period of five years after the date of this Agreement (such additional one-third of the Shares being hereinafter referred to as the "Five-Year Shares"). In the event of a Termination prior to the expiration of said five-year period, the Company shall have an option exercisable within 60 days after the date of such Termination to purchase any or all of the Five-Year Shares for a purchase price of $.10 per share.

\*      \*      \*      \*      \*      \*      \*

14. In addition to the provisions of Sections 11 through 13 of this Agreement, the Employee agrees as follows:

(a) Upon the written request of the Company delivered to the Employee at any time after July 1, 1973 and prior to July 1, 1975 (the date of delivery to the Employee of such written request being hereinafter referred to as the "Exercise Date"), the Employee will sell to the Company one-half, but not less than one-half, of the Shares (such one-half of the Shares being hereinafter referred to as the "Option Shares"). The written request delivered pursuant to this Section 14 shall specify the time for the delivery and payment of the Option Shares (the "Closing") which shall be a date not less than 10 days and not more than 20 days after the Exercise Date.

(b) The purchase price for the Option Shares shall be the Market Value (as hereinafter defined) of such Option Shares as of a date determined in accordance with this paragraph (b). \* \* \*

\*     \*     \*     \*     \*     \*     \*

(f) The option granted to the Company pursuant to this Section 14(i) is in addition to any other options or rights granted to the Company in respect of the Shares pursuant to Sections 11, 12 and 13 of this Agreement, and (ii) may be assigned by the Company. In the event of an assignment of this option all other rights, options, obligations and restrictions applicable to the Shares and contained in Sections 11, 12 and 13 hereof shall remain in full force and effect, provided, however, that in the event of the exercise of this option all such other rights, options, obligations and restrictions shall terminate.

15. The Company may, in its absolute discretion, waive or terminate any or all of the restrictions on the sale, pledge or transfer of, and any or all rights of the Company to repurchase, Shares contained in Sections 11, 12 and 13.

On May 22, 1970, concurrent with the issuance of 40,000 shares of common stock to petitioner, common stock was also issued at 10 cents per share to six other individuals, all of whom executed employment and stock purchase agreements similar to that executed by petitioner except for differences as to name, annual salary, employment capacity, and the number of shares of stock purchased.

Since the 40,000 shares of common stock issued to petitioner were divided into three categories, the result was that petitioner had 13,333 free shares, 13,334 4-year shares, and 13,333 5-year shares. At the time of the issuance of the 40,000 shares to petitioner, the fair market value of the stock was 10 cents per share.[2] The restrictions were imposed by the company on the 4-year shares and the 5-year shares to provide some assurance that key personnel would remain with the company for a number of years.

Within a few days after purchasing the 40,000 shares of stock, petitioner sold 4,000 free shares, 4,000 4-year shares, and 4,000 5-year shares to close friends and relatives. The 4-

---

[2]Although the parties have stipulated that each share had a fair market value of 10 cents, we doubt that such was really the case. It strikes us as being highly unusual that those shares which were restricted had the same fair market value as those which were unrestricted. We have no doubt that the total stated amount of consideration, $4,000, represented fair market value for the entire package of 40,000 shares. What we do question, however, is the allocation contained in the employment and stock purchase agreement of a price of 10 cents to each share, regardless of whether such share is restricted or unrestricted. Cf. *Gresham v. Commissioner*, 79 T.C. 322 (1982). Certainly, absent the stipulation by the parties, we would not be conclusively bound by the allocation made in the agreement. See *Lemmen v. Commissioner*, 77 T.C. 1326 (1981). However, since the stipulation made goes to the heart of the controversy and was obviously freely entered into, we will accept such fact as represented by the parties to be true and accordingly find that each share had a value of 10 cents.

year and 5-year shares were transferred subject to the applicable restrictions. These shares were transferred at their fair market value of 10 cents a share, and petitioner realized no gain or loss on the transfer.

On June 26, 1970, the company sold to Technology Ventures, Inc. (TVI), a wholly owned subsidiary of Emerson Electric, 467,000 shares of the company's preferred stock at $3.10 per share, and assigned to TVI the option granted by the employee-shareholders to the company for repurchase of the stock sold to them. With the exception of the stock purchased by G. H. Walker & Co., no stock issued by the company prior to June 26, 1970, was to persons other than officers, directors, or employees of the company. One of the directors of the company was a representative of G. H. Walker & Co.

On July 13, 1973, petitioner's employment contract with the company was amended to increase his annual salary to $29,000.

On November 9, 1973, TVI exercised its option on a portion of the shares owned by the employee-shareholders of the company. As a result of this action by TVI, petitioner sold 4,667 4-year shares to TVI at a price of $18 per share. On June 27, 1974, TVI again exercised its option on a portion of the shares owned by the employee-shareholders of the company and as a result, petitioner sold 2,240 5-year shares to TVI at $4 per share. On July 1, 1974, the restrictions imposed upon petitioner's 4-year shares by paragraph 11 of the employment and stock purchase agreement lapsed. At that time petitioner owned 4,667 4-year shares and the fair market value of the shares on that date was $6 per share. The Form W–2 issued to petitioner by the company for the taxable year 1974 included as compensation the sum of $8,736, which represented the $3.90-per-share difference between the 10 cents per share petitioner had paid for his stock and the $4 per share price he received for the $2,240 5-year shares he sold to TVI on June 27, 1974. The company also included as compensation on petitioner's Form W–2 for 1974 the excess value of the 4,667 4-year shares owned by petitioner on July 1, 1974, when the restrictions with respect to those shares terminated, over petitioner's cost basis of the shares. The amount was computed at $5.90 per share, so the total excess value aggregated $27,535.

On December 1, 1974, petitioner and the company entered into an agreement terminating petitioner's employment with the company effective March 24, 1975. Under the terms of the agreement, the restrictions imposed on petitioner's 5-year shares were also terminated effective March 24, 1975.

The company included as compensation on petitioner's 1975 Form W–2 the excess value ($3.33 per share) of 2,426 of the 5-year shares owned by petitioner on March 24, 1975. The aggregate value was shown as $8,078.58.

Petitioners, on their 1974 Federal income tax return, reported the $8,736 of gain on the sale of 2,240 5-year shares to TVI as income, but did not report as income the $27,535 of excess value of the 4,667 4-year shares owned by petitioner on July 1, 1974.

The fair market value of the 7,093 5-year shares owned by petitioner on March 24, 1975, was $3.43 per share. Petitioner did not include in the income reported on his Federal income tax return for 1975 either the excess value of $8,078.58 with respect to 2,426 5-year shares shown on his Form W–2 from the company or any amount of fair market value with respect to the remaining portion of the 7,093 5-year shares which he held on March 24, 1975.

Respondent, in his notice of deficiency to petitioners, increased their income for the calendar year 1974 by $27,535 and increased their income for the calendar year 1975 by $8,078 for "Compensation-Western Digital Corporation." Respondent explained the adjustment by stating—

that the excess of the fair market value on 6–27–74 for 1974 and 3–24–75 for 1975, the dates on which restrictions on stock received from General Digital Corporation (later changed to Western Digital Corporation) lapsed, and the 10¢ per share you paid for such stock is taxable to you as ordinary income pursuant to the provisions of section 83 of the Internal Revenue Code. * * *

By an amendment to answer, respondent claimed an increased deficiency for 1975 based upon petitioner's ownership of 7,093 rather than 2,426 5-year shares on March 24, 1975, with a fair market value of $3.43 per share.

Petitioners, in their petition, claimed error in reporting the $8,736 gain on the 2,240 5-year shares sold by petitioner to TVI on June 27, 1974, as ordinary income and claimed a refund based on this alleged overreporting of income. Petitioners, by amendment to their petition, claimed that on December 11,

1974, petitioner sold 1,000 shares of stock of the company for $5,000 and that the stock sold had a basis of $6,000 and that costs incurred in connection with the sale were $159.50, resulting in a long-term capital loss of $1,159.50 rather than a gain of $4,440.50 as reported on Schedule D of their 1974 tax return. Petitioners further alleged that during 1975, petitioner sold 5,000 shares of the company's stock at a gross sales price of $23,875 and that petitioner had a basis in 3,667 of these shares of $6 per share and a basis in 1,333 of the shares sold of $3.43 per share, making an aggregate basis of $26,574.19; and that they incurred costs in connection with the 1975 stock sale in the amount of $847.10, resulting in a long-term capital loss of $3,546.29 from the sale rather than a long-term capital gain of $22,527.90 as reported on Schedule D of their 1975 income tax return.

The parties agree that, for the purposes of this case, the 4-year shares were subject to a substantial risk of forfeiture until July 1, 1974, and the 5-year shares were subject to a substantial risk of forfeiture until March 24, 1975.[3]

Petitioner's position is that section 83 is inapplicable to the stock he received from the company since this stock was not received in connection with the performance of services but was purchased as an investment and, further, that in any event, since at the time he purchased the stock he paid the fair market value for it, section 83(a) does not apply to the stock he received. In this respect, petitioner contends that section 83(a) was intended to apply to bargain purchases of stock and not to stock bought at its fair market value.

It is respondent's position that petitioner comes directly within the provisions of section 83(a) and, since petitioner did not elect to come under the provisions of section 83(b), he is taxable in accordance with the provisions of section 83(a).[4]

We have recited in some detail the facts surrounding petitioner's acquisition of stock in the company. On the basis of these facts, we conclude that the transfer of the stock to petitioner was in connection with the performance of services

---

[3]The parties expressly agreed that this stipulation should not constitute a concession of any issue nor an admission of any fact by petitioners with respect to the taxable year 1973.

[4]The parties stipulated that petitioner did not make an election under sec. 83(b) of the Code.

by him for the company. The minutes of the first meeting of the board of directors of the company held on April 24, 1970, recited that discussions had been held with certain persons concerning their investment in the corporation through the purchase of 264,000 shares of common stock. The resolution authorizing the issuance of the shares specified the individuals to whom shares were to be issued and the number of shares to be issued to each. The resolution did not specifically state that these were the individuals who had been approached with respect to becoming employees or officers of the company. However, the fact that the individuals were specifically named and that they did, in fact, all become company officials shows that the issuance of stock to them was in connection with their becoming connected with the company. Therefore, we do not draw the inference that petitioner would have us draw from these minutes that the 264,000 shares were to be issued solely to the individuals named as investors in order to obtain funds for the company.

If any doubt existed from the minutes as to the reason for the issuance of stock to petitioner and certain other officers of the company, the stock purchase and employment agreement removes such doubt. All the company officers who acquired a part of the 264,000 shares of stock entered into an agreement with the company which recited that in order to raise capital for the company's initial operations "while at the same time providing the employee with an additional interest in the company," the company desired to sell stock to the employee and the employee desired to buy the stock. This is a clear indication that the stock was issued to petitioner by the company in connection with the performance of services. The provision in the stock purchase and employment agreement, permitting the company to repurchase the shares at 10 cents a share if petitioner left the employ of the company before the lapse of the 4-year and 5-year periods during which the stock was restricted, is also a clear indication that the shares were issued in connection with the performance of services. The parties have stipulated that the purpose of the restrictions was to provide some assurance that key personnel would remain with the company a number of years.

While the fact that a taxpayer paid fair market value for property transferred to him by his employer is some indication

that the property was not transferred in connection with the performance of services, it is not conclusive. The contrary evidence in this record outweighs any inference that might otherwise be drawn from the fact that petitioner paid fair market value for the stock.

On the basis of this record, we conclude that the 40,000 shares of stock of the company were issued to petitioner in connection with the performance of services.

Section 83(a)[5] provides that where property is transferred to any person in connection with the performance of services, the fair market value of such property, determined without regard to any restrictions other than a restriction which by its terms will never lapse, at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, in excess of the amount paid for the property shall be included in

---

[5]Sec. 83(a)(1) and (2) provides as follows:

SEC. 83. PROPERTY TRANSFERRED IN CONNECTION WITH PERFORMANCE OF SERVICES.

(a) GENERAL RULE.—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

(2) the amount (if any) paid for such property,

shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.

This is not to say that the issuance of shares to persons who are employees must always be considered as made in connection with the performance of services. Sec. 1.83–3(f), Income Tax Regs., acknowledges that the existence of other nonemployees who are entitled to buy stock on the same terms and conditions as the employees might indicate the transfers were not in recognition of the performance of services. In the instant case, however, the shares in issue were transferred in connection with the performance of services. All of the parties receiving a part of the 264,000 shares were employees. The only shares of common stock issued prior to the issuance of the 264,000 shares were issued to the organizers of the corporation, one of whom was its president. Although shares were issued to a corporation, one of the directors of the company was a representative of that corporation, and for practical purposes, the corporation should be considered as an employee. Therefore, no inference arises from the facts here present that nonemployees were permitted to buy on the same terms as employees, but, rather, the inference is that only employees were issued stock.

the gross income of the person who performed such services. There is nothing in the statute to indicate that the property must have a fair market value at the time of the transfer, in excess of the amount paid.

Petitioner argues, however, that, because of certain references in the legislative history to the transfer of stock interests to employees as compensation or at an amount less than fair market value, section 83(a) should be interpreted as applying to bargain purchases, where stock or property is transferred to an employee at less than its fair market value, and not to petitioner's acquisition of a stake in the corporation under the circumstances present here.

A transfer of property is subject to section 83, whether the transfer is in respect to past, present, or future services. Sec. 1.83–3(f), Income Tax Regs. While we have found the stock to have been transferred in connection with petitioner's performance of services, obviously the company and petitioner entered into the transaction to allow petitioner to have a stake in the business. However, the legislative history to section 83 is explicit that where a transfer is made in connection with the performance of services, the statute is to apply in spite of such investment motives. H. Rept. 91–413 (1969), 1969–3 C.B. 200; S. Rept. 91–552 (1969), 1969–3 C.B. 423, 500–501. The Senate report, in pertinent part, states as follows:

It has been suggested by some that restricted stock plans are not in fact, deferred compensation arrangements, but rather are a means of allowing key employees to become shareholders in the business. This line of reasoning, however, overlooks the fact that in 1964 Congress specifically dealt with the matter of the appropriate means by which key employees could be provided with a stake in the business when it revised the treatment of qualified employee stock options.

A series of specific requirements were provided by Congress at that time which must be satisfied in order to obtain favorable tax treatment in the case of stock options. A number of these requirements were designed to decrease the compensatory nature of stock options and to place more emphasis on stock options as a means of giving employees a stake in the operation of their business. Agreeing with the House bill, the committee does not believe it was intended that substantially similar tax benefits should be available under a slightly different type of arrangement, such as a restricted stock plan, where none of the conditions which is specified for qualified stock options must be satisfied.

To the extent that a restricted stock plan can be considered a means of giving employees a stake in the business, the committee believes [121] the present tax treatment of these plans is inconsistent with the specific rules

provided by Congress in the case of qualified stock options, which were considered by Congress as the appropriate means by which an employee could be given a shareholder's interest in the business.

While Congress recognized the favored treatment that it previously provided under qualified employee stock option plans, it recognized that such provisions were a special act of legislative grace. Congress, in the quoted legislative history, has clearly expressed the intention that section 83 is to have the broadest application. We consider this statement of congressional purpose to be of paramount importance in interpreting section 83. In order that such legislative purpose be fulfilled, that section should be interpreted to apply broadly. Absent specific provision that a particular transfer is excepted from section 83, this section is applicable. See sec. 83(e).

We have considered all the statements in the committee reports and find nothing to support petitioner's position that the clear words of section 83(a) were intended to mean other than what they state. See H. Rept. 91–413 (1969), 1969–3 C.B. 200, 254–256; S. Rept. 91–552 (1969), 1969–3 C.B. 423, 500–503.

Section 83(b)[6] was added by the Senate to the bill as received from the House. In explaining the reason for adding this provision, it is stated in S. Rept. 91–552 (1969), 1969–3 C.B. 423, at 502:

> To add flexibility, the committee adopted a provision allowing recipients of restricted property the option of treating it as compensation in the year it is received, even though it is nontransferable and subject to a substantial

---

[6]Sec. 83(b) provides as follows:

SEC. 83(b). ELECTION TO INCLUDE IN GROSS INCOME IN YEAR OF TRANSFER.—

(1) IN GENERAL.—Any person who performs services in connection with which property is transferred to any person may elect to include in his gross income, for the taxable year in which such property is transferred, the excess of—

(A) the fair market value of such property at the time of transfer (determined without regard to any restriction other than a restriction which by its terms will never lapse), over

(B) the amount (if any) paid for such property.

If such election is made, subsection (a) shall not apply with respect to the transfer of such property, and if such property is subsequently forfeited, no deduction shall be allowed in respect of such forfeiture.

(2) ELECTION.—An election under paragraph (1) with respect to any transfer of property shall be made in such manner as the Secretary or his delegate prescribes and shall be made not later than 30 days after the date of such transfer (or, if later, 30 days after the date of the enactment of the Tax Reform Act of 1969). Such election may not be revoked except with the consent of the Secretary or his delegate.

risk of forfeiture. If this election is made, the restricted property rules are not to apply, and later appreciation in the value of the property is not to be treated as compensation. However, if the property is later forfeited, no deduction is to be allowed with respect to the forfeiture. * * *

The addition of this flexibility rule, without any mention in either the statute or the legislative history that section 83(a) is inapplicable to property transferred to an employee at its fair market value, clearly indicates that section 83(a) was intended to apply to stock which was transferred to the employee in connection with the performance of services, even though the transfer was at fair market value at the time the stock was issued. Thus, in our view, the clear indication from the legislative history is that an election under section 83(b) is the sole means by which post-transfer appreciation may be removed from being treated as compensation.

Petitioner argues that since section 83(b) refers to the excess of the fair market value of such property at the time of transfer over the amount paid for such property, it was not intended to apply to a transfer at fair market value. We do not so interpret the statute. In our view, the "excess" in the circumstances of a transfer at fair market value would be zero.[7]

We conclude that section 83(a), by its terms, applies to

---

[7]Sec. 1.83–2, Income Tax Regs., which was promulgated on July 21, 1978, by T.D. 7554, 1978–2 C.B. 71, specifically states that—

"The fact that the transferee has paid full value for the property transferred, realizing no bargain element in the transaction, does not preclude the use of the election as provided for in this section [83(b)]."

Petitioner points out that the temporary regulation filed Jan. 16, 1970, T.D. 7021, 1970–1 C.B. 22, stated that the person receiving property in connection with the performance of services—

"may elect to include in his gross income for the taxable year in which such property is transferred, the excess of the fair market value of such property at the time of transfer * * * over the amount (if any) paid for such property. * * * "

The stipulated facts in this case show that during the audit of this case, petitioners requested the Internal Revenue agent to obtain a National Office technical advice memorandum with respect to the application of sec. 83(a) to the 4-year and 5-year shares, and that on Apr. 14, 1978, such a technical advice memorandum was issued by the National Office contrary to the position petitioners took with respect to the application of sec. 83(a) to shares transferred at their fair market value. Petitioner states that the addition of the provision in the regulation with respect to sec. 83(b), that the fact that the property was transferred at fair market value did not keep the section from being applicable, was added to the proposed draft between Apr. 14, 1978, and July 21, 1978, when the regulation was promulgated, and from this concludes that it was the technical advice requested in his own case which caused this addition to the regulation. Whether, in fact, petitioner is correct in

property transferred in connection with the performance of services even though that property is transferred at its fair market value.[8] Petitioners argue that each of the other cases which have come before this Court have involved "bargain purchases" of stock. Certainly, the cases to which respondent and petitioners directed our attention did involve purchase of property at less than its fair market value at the date of purchase without consideration of the restrictions. However, in each of these cases, the taxpayer was arguing some inequity in the application of section 83 to his situation. We have effectively held that section 83 should be applied according to its terms, whether or not it might result in some inequity in a specific case. See *Sakol v. Commissioner*, 67 T.C. 986, 996 (1977), affd. 574 F.2d 694 (2d Cir. 1978), in which we stated that although—

some unfairness and inequity may result from the operation of section 83, Congress could rationally have concluded that such a result was justified by the ease and certainty of the section's operation. * * *

See also *Pledger v. Commissioner*, 71 T.C. 618, 627 (1979), affd. 641 F.2d 287 (5th Cir. 1981), in which we held that restrictions imposed by law were restrictions within the meaning of section 83(a)(1), and again stated that where some unfairness and inequity may result, Congress could rationally have concluded that such inequity was justified because of the ease and certainty of the section's operation.[9]

In *Cohn v. Commissioner*, 73 T.C. 443, 446 (1979), we held that the receipt of shares of stock as a finder's fee by persons

his surmise is immaterial since, in our view, the addition of the specific statement that the election could be made where property was transferred at its fair market value is merely making more explicit a fact which is inherent in the statute itself.

[8]The parties stipulated that the 13,333 "free shares" resulted in no income for any year since there was no excess of fair market value over the amount paid by petitioner for the shares at the date of their transfer. Since these shares were not restricted, the date applicable for the inclusion of the excess of their fair market value over their cost in petitioner's income would be the date of their transfer to petitioner. That amount was zero. In making this stipulation, petitioner reserved his right to contend that sec. 83(a) would in no event be applicable to the shares.

[9]See also *Cassetta v. Commissioner*, T.C. Memo. 1979–384, where we held that restricted stock received by an individual as a "finder's fee" was subject to the provisions of sec. 83, and stated:

"We are not unaware of the hardship our holding may place on petitioner; the proceeds of his sale of Integrated stock are insufficient to cover his tax liability for the receipt of the same shares. However, we cannot ignore the unambiguous language of the statute. * * * *"

who were independent contractors and not employees of the corporation was subject to tax under section 83. We stated:

While restricted stock plans involving employers and employees may have been the primary impetus behind the enactment of section 83, the language of the section covers the transfer of any property in connection with the performance of services "to *any person* other than the person for whom such services are performed." * * * [Emphasis added.]

It is unfortunate that the petitioner in this case did not elect the provisions of section 83(b). The transfer of the stock to him was so soon after the enactment of section 83 that he may well have been unaware of the provisions of section 83(b) at the time of the transfer. Such an unfortunate circumstance does not justify holding section 83(a) to be inapplicable to a transfer of stock to which it is clearly applicable.

We therefore conclude that petitioner must include in his gross income for the taxable years 1974 and 1975 the difference in the fair market value of the stock of the company at the time this stock was not subject to a substantial risk of forfeiture and the price he paid for the stock. We also conclude that the amount received by petitioner for the 2,240 5-year shares sold in 1974 to TVI in excess of the cost of those shares to him is ordinary income to petitioner. See sec. 1.83–1(b), Income Tax Regs.

Petitioners, on brief, admitted that they had been unable to substantiate the allegations in their amendment to petition with respect to the basis of certain shares of stock sold in 1974 and 1975. Because of this failure of proof, petitioners have failed to establish any error in the basis of these shares used in computing the gain from the sale on their tax returns for these years.

We decide the issues here presented for respondent. However, since we have concluded that the evidence establishes that respondent understated the number of shares with

respect to which any substantial risk of forfeiture ceased in 1975,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

FAY, *J.*, dissenting: I respectfully dissent. In my view, section 83 was enacted in response to abuses in deferred compensation plans. Read as a whole, it applies only when there is a bargain element in the transfer which is in consideration or recognition of the performance of services.

Although I, too, find the parties' stipulation that the restricted and unrestricted stock had the same value somewhat troublesome, I am not willing to ignore it. Accordingly, I accept as fact that no bargain element was involved when petitioners first acquired the stock.

Section 83 applies to transfers "in connection with the performance of services." To me, the legislative history indicates that the section is intended to apply only where the taxpayer receives stock as compensation in some way for services; in other words, only when there is a bargain element involved in the transfer. See generally the dissenting opinion of Judge Whitaker, p. 881. Consistent with the legislative history, the regulations refer to transfers made "as compensation for services," "in recognition of the performance of, or the refraining from the performance of services." See secs. 1.83–2(a) and 1.83–3(f), Income Tax Regs. Whether the transfer is in consideration or recognition of the performance of services is essentially a question of fact. See sec. 1.83–3(f), Income Tax Regs. When fair market value is paid for the stock, as stipulated to by the parties herein, I find it conclusive that no part of the transfer was made in recognition of the performance of services. In the instant case, we have nothing more than an equity investment in the corporation.

Section 1.83–2(a), Income Tax Regs., provides that the election under section 83(b) is not precluded when "full value" is paid for the stock. Unfortunately, the term "full value" is not defined. If "full value" means fair market value determined without regard to the restriction, the regulation is, in

my opinion, an unwarranted extension of the statute and I would not allow it to govern the outcome of this case.[1]

For cases like this one, interpreting "full value" to mean fair market value determined without the restriction converts the section 83(b) election provisions into a trap. Section 83(b) permits a taxpayer receiving restricted stock to include in gross income for the year of receipt the "excess" of the fair market value (determined without regard to lapse restrictions) over the amount (if any) paid for the stock. He thereby avoids the necessity for including in gross income the excess of the fair market value of the stock over its cost in the year the restriction lapses. What taxpayer reading section 83(b) would know to make such an election when he paid fair market value for stock determined without the restriction and, therefore, had nothing to include in gross income in the year he received the stock?

Only by reading section 83 in disregard of its intended purpose and the legislative history can the result of the majority be reached. I do not think Congress intended to tax at ordinary rates the gain on the sale of restricted stock which was bought at the same price that unrestricted stock was sold. True, that result can be avoided by making the section 83(b) election, but I do not think Congress intended to require a taxpayer to elect to include something in gross income when that taxpayer had nothing to include in gross income. For these reasons, I would hold section 83 does not apply to these facts.

FEATHERSTON, GOFFE, and HAMBLEN, *JJ.*, agree with this dissenting opinion.

WHITAKER, *J.*, dissenting: I respectfully dissent. The issue in this case is whether or not the 4-year and 5-year shares of General Digital Corp. issued to petitioner in 1970 are subject to the provisions of section 83. By its terms, section 83 applies where property (i.e., stock) is transferred to a person "in

---

[1]We note petitioners' claim that the pertinent language of the regulation was promulgated in 1978 in response to their request for a technical advice memorandum from the National Office. Before that time, the regulation contained no language purporting to apply sec. 83 when full value for the stock was paid.

connection with the performance of services." On the facts found, the majority concludes that the transfer of the stock to petitioner was in connection with the performance of services for the company. However, nowhere is the phrase "in connection with the performance of services" defined. We must, therefore, look to the legislative history for assistance in deriving the congressional intent. *Tufts v. Commissioner*, 70 T.C. 756, 769 (1978), revd. on other grounds 651 F.2d 1058 (5th Cir. 1981), cert. granted 456 U.S. 960 (1982); *Ziegler v. Commissioner*, 70 T.C. 139, 143 (1978); *Sheppard & Myers, Inc. v. Commissioner*, 67 T.C. 26, 28 (1976).

Section 83 was added to the Code as a part of the Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 588. Section J of H. Rept. 91–413[1] describes the problem which section 83 (section 85 of the original House bill) was designed to cure in the following language:

*Present law.*—Present law does not contain any specific rules governing the tax treatment of deferred compensation arrangements known as restricted stock plans.

A restricted stock plan, generally, is an arrangement under which an employer transfers stock to one or more of his employees (often without the payment of any consideration), where the stock is subject to certain restrictions *which affect its value.* * * * [Emphasis supplied.]

*       *       *       *       *       *       *

The existing Treasury regulations generally provide that no tax is imposed when the employee receives the restricted stock. Tax is deferred until the time the restrictions, lapse; at that time, only the value of the stock when it was transferred to the employee (determined without regard to restrictions) is treated as compensation, * * * Thus, under existing regulations there is a deferral of tax with respect to this type of compensation, and any increase in the value in the stock between the time it is granted and the time when the restrictions lapse is not treated as compensation.

*General reasons for change.*—The present treatment of restricted stock plans is significantly more generous than the treatment specifically provided in the law for similar types of deferred compensation arrangements. * * *

The House report goes on to emphasize the disparity in treatment under then-existing law between nonqualified deferred trusts of various sorts where the employee is currently taxed as compensation on the value of the stock at the time of the transfer and restricted stock plans where the tax is

[1] 1969–3 C.B. 200, at 254.

deferred. The report also points to the qualified stock option arrangements then in the Code which "were designed to decrease the compensatory nature of stock options" by, among other provisions, requiring that the stock subject to the option must have an option price equivalent to fair market value at the time of issuance of the option, requiring the employee upon exercise to pay at least the market value as of the date when the option was received. The report comments that "restricted stock, on the other hand, may be given to an employee for no consideration at all."

In describing the new provision, the report first states that where property is transferred by reason of the performance of services and it is either transferable or not subject to a substantial risk of forfeiture, the transferee is required to include in income "the amount by which the fair market value of the property exceeds the amount (if any) he paid for the property." While the report refers to property, it is clear that the committee was talking in essence about restricted stock.[2] Thus, section J of the House report was intended to alter the tax treatment of restricted stock, that is, stock which is issued subject to a restriction which has a significant depressant effect on its value. The Technical Explanation of the bill which accompanies the House report confirms this interpretation in the following language:

Under existing regulations if property is transferred subject to a restriction *which has a significant effect on value,* no part of the amount attributable to the transfer of such property is included in gross income until the time the restriction lapses or the property is sold or exchanged, whichever occurs earlier. Under new subsection (a), *in such a case,* the amount attributable to the transfer of property shall be included in gross [62] income * * * . Therefore, under new subsection (a) even if property transferred is subject to a restriction which has a significant effect on value, if the beneficial interest in such property is not subject to a substantial risk of forfeiture, the amount attributable to such transfer shall be included in gross income for the taxable year in which such beneficial interest is transferred. [1969–3 C.B. 340, at 376. Emphasis supplied.]

---

[2]H. Rept. 91–413 (1969), 1969–3 C.B. 255, includes the following comment:

"Restrictions which by their terms never lapse, for example, a requirement that an employee sell the stock back to the employer at book value or a formula price if he terminates his employment, are not, in your committee's opinion, tax-motivated and should be distinguished from restrictions designed to achieve deferral for tax saving purposes."

The solution adopted by the House was to defer the tax only when the restrictions made the property subject to a substantial risk of forfeiture or not transferable. Thus, if such a restriction were not present, the difference between the amount paid and fair market value, determined without regard to lapse restrictions, was immediately taxable. Otherwise, the tax was computed and paid in the year the restrictions lapsed.

S. Rept. 91–552[3] uses substantially the same introductory language as the House report, defining a restricted stock plan as one "where the stock is subject to certain restrictions which affect its value." While there are minor differences between the House and Senate bills, it is explicitly clear from the Senate report that it, too, was considering only that situation where the employee receives property like restricted stock subject to restrictions which depress its value. The major difference in the taxing scheme adopted by the Senate was to defer the tax not only so long as the employee's rights were subject to a substantial risk of forfeiture but also until the property was transferable without the transferee being subject to the forfeiture restriction. The Senate modifications also included section 83(b), which allowed "recipients of restricted property the option of treating it as *compensation* in the year it is received." (Emphasis supplied.) The restricted property provisions of the bill as enacted substantially conform to the Senate version.

From this legislative history, it is apparent that property is not to be deemed to be issued in connection with the performance of services except where on the date of issue there is a discrepancy between the fair market value of the property subject to the restrictions and its fair market value without restrictions. The statute was designed to counter the then-existing practice of attaching lapse restrictions to stock in order to reduce temporarily its value, thus creating the compensation element which was deferral of tax on the economic gain at the time of purchase, that is, the difference on the date of issue between the fair market value without lapse restrictions and the amount paid for the property. The

---

[3] 1969–3 C.B. 423, 500–502.

congressional cure was to defer the incidence of tax until the restrictions lapse, at which point both the economic gain at the time of issuance and the normal appreciation thereafter were subject to tax at ordinary income rates. However, section 83 is not limited to the deferral circumstance. Where property is issued subject only to restrictions which do not lapse, section 83 imposes an immediate tax upon the bargain element, in that case, on the difference between the price paid and the fair market value of the restricted property on the date of issuance. In both instances, however, the statute is focusing only on property transfers subject to restrictions which materially affect value.

If the restrictions do not affect the value, or if there are no restrictions, under then-existing law, an employee purchasing property paid tax, as now, on the bargain element, if any. No avoidance of tax was present in that case and a legislative cure was unnecessary. The only abuse at which section 83 was directed arose where restrictions which lapse depressed the value artificially or made valuation too uncertain to determine, thus causing a deferral of tax under then-existing Treasury regulations. In this case, the parties have stipulated that the restrictions did not affect fair market value on the date of issue, that the 4-year and 5-year shares were worth the same price paid by petitioner as well as other persons for nonrestricted stock. While this fact may seem highly artificial, the parties, as well as the majority, have accepted the stipulation without apparently realizing that this fact removes the case from section 83.

Petitioner argues that section 83(b), in referring to the excess of fair market value over the amount paid, demonstrates that section 83 was not intended to apply to a transfer at fair market value. The majority disagrees, suggesting that in petitioner's circumstance, the election should be made to report and pay tax on zero compensation received in the year of issuance. The majority also points to section 1.83-2(a), Income Tax Regs., which specifically provides that payment of full value for the property transferred does not preclude the use of the section 83(b) election. I find that my interpretation of the "somewhat limited scope" of section 83(a) is not inconsistent with section 83(b) or with this section of the regulations. Neither do I disagree with the majority's conclu-

sion that in some cases a taxpayer should exercise the election and report zero compensation income.

It must be remembered that the House and Senate committees considered that in the usual case, the employee would make a bargain purchase, paying little or nothing for stock under a restricted stock plan. Where the property is subjected only to restrictions which do not lapse, the bargain element under section 83(a) is taxable in the year of receipt. If there were no bargain element, the employee would have no tax to pay. But if the property carries lapse restrictions (with or without nonlapsing restrictions) section 83(a) defers the tax unless the section 83(b) election is made. And only by making that election, as the majority points out, can the employee avoid tax on appreciation between the date of issue and the date on which the restrictions lapse.

Certain language in the regulations applying to section 83(b) is of significance:

If property is transferred (within the meaning of sec. 1.83–3(a)) * * * the person [the employee] * * * may elect to include in gross income under section 83(b) the excess (if any) of the *fair market value* of the property at the time of transfer (determined without regard to any lapse restriction, * * * over the amount (if any) paid for such property, * * * . The fact that the transferee has paid *full value* for the property transferred, realizing no bargain element in the transaction, does not preclude the use of the election as provided for in this section. * * * [Sec. 1.83–2(a), Income Tax Regs. Emphasis supplied.]

It is not unreasonable to suppose that some employees would be required to pay the "full value" for the property, that is, the value of the property with the restrictions in place, and it is at least possible that an employee might be required to pay a premium, i.e., full value without taking into account the lapse restrictions. The language of section 1.83–2(a), Income Tax Regs., simply makes it clear that the election is available in those circumstances where the employee does not, in fact, make a bargain purchase,[4] that is, he pays full value for the restricted stock, or where the purchase price is the same as the price paid by others who purchase free of restrictions, thus

---

[4]See, e.g., *Gresham v. Commissioner,* 79 T.C. 322 (1982), where we recognized that for purposes of the minimum tax, the fair market value of lettered stock was the price at which it could be sold on the date of issue and subject to the SEC mandated restriction.

paying a premium. The fact that an employee does not realize a "bargain element in the transaction" does not mean the employee will have no tax to pay, since the election requires including in income the fair market value without regard to any lapse restrictions. If the employee were to pay a premium, it would be even more important to make the election, reporting possibly a zero tax in order to avoid tax on the appreciation when the restrictions expired.

The trouble with petitioner's approach, and that of the majority, is the focus on the amount paid for the stock, rather than on the intended scope of the statute. That results directly from the artificiality of the transaction as stipulated, since commonsense tells us that restrictions such as the ones imposed in this case would certainly depress the value of the shares vis-a-vis unrestricted stock. Thus, section 83 should perhaps apply since petitioner, in reality, paid a premium for his restricted shares. But in view of the stipulation, accepted by the majority, section 83 simply cannot apply because in this unreal factual context the parties have agreed that the restrictions did not affect value. Thus, the stock issued to the particular group of employees, including petitioner, was not part of a restricted stock plan.[5]

For these reasons, I would find for the petitioner on this issue.

FEATHERSTON and GOFFE, *JJ.*, agree with this dissenting opinion.

---

[5]In this case, I do not reach the issue of whether sec. 83 applies in every case in which an employee purchases stock subject to restrictions affecting value. Sec. 1.83–3(f), Income Tax Regs., states in part:

"The existence of other persons entitled to buy stock on the same terms and conditions as an employee, whether pursuant to a public or private offering may, however, indicate that in such circumstances a transfer to the employee is not in recognition of the performance of, or the refraining from performance of, services. * * * "

Petitioner argues that payment of the issue price shows that the stock was not issued as compensation, but in connection with an investment. The determination whether stock is issued as compensation, as opposed to being acquired as an investment, requires an analysis of all facts and circumstances surrounding the transfer of the restricted stock. Here, the majority has found that the stock was not purchased as an investment. I do not think the facts as found necessarily require that determination, but in my view it is unnecessary and, therefore, unwise to make a factual analysis since the transfer was entirely outside the scope of sec. 83 by reason of the stipulation as to the value of the restricted stock. The circumstances under which a purchase by an employee of restricted stock may not be subject to sec. 83 because acquired for investment purposes must await a proper case with real, not artificial, facts.