**Lawrence J. ALVES and Myra L. Alves, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 83–7491.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 5, 1984.

Decided June 5, 1984.

Michael R. Moore, James G. Harrigan, Harrigan, Ruff & Osborne, San Diego, Cal., for petitioners-appellants.

Jay W. Miller, Dept. of Justice, Washington, D.C., for respondent-appellee.

Before KENNEDY, SCHROEDER, and BOOCHEVER, Circuit Judges.

SCHROEDER, Circuit Judge.

■ Lawrence J. Alves appeals a Tax Court decision sustaining the Commissioner's finding of deficiency for 1974 and 1975.

*Alves v. Commissioner*, 79 T.C. 864 (1982). The appeal raises an unusual question under section 83 of the Internal Revenue Code, 26 U.S.C. § 83 (1982). Section 83 requires that an employee who has purchased restricted stock in connection with his "performance of services" must include as ordinary income the stock's appreciation in value between the time of purchase and the time the restrictions lapse, unless at the time he purchased the stock he elected to include as income the difference between the purchase price and the fair market value at that time.[1] The issue here is whether section 83 applies to an employee's purchase of restricted stock when, according to the stipulation of the parties, the amount paid for the stock equaled its full fair market value, without regard to any restrictions. The Tax Court, with two dissenting opinions, held that section 83 applies to all restricted stock that is transferred "in connection with the performance of services," regardless of the amount paid for it. 79 T.C. at 878. We affirm.

## FACTS

General Digital Corporation (the company) was formed in April, 1970, to manufac-

**1.** Section 83 of the Internal Revenue Code states in relevant part:

(a) GENERAL RULE—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

(2) the amount (if any) paid for such property, shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.

(b) ELECTION TO INCLUDE IN GROSS INCOME IN YEAR OF TRANSFER—

(1) IN GENERAL—Any person who performs services in connection with which property is transferred to any person may elect to include in his gross income for the taxable year in which such property is transferred, the excess of—

(A) the fair market value of such property at the time of transfer (determined without regard to any restriction other than a restriction which by its terms will never lapse), over

(B) the amount (if any) paid for such property.

If such election is made, subsection (a) shall not apply with respect to the transfer of such property, and if such property is subsequently forfeited, no deduction shall be allowed in respect of such forfeiture.

(2) ELECTION—An election under paragraph (1) with respect to any transfer of property shall be made in such manner as the Secretary prescribes and shall be made not later than 30 days after the date of such transfer. Such election may not be revoked except with the consent of the Secretary.

ture and market micro-electronic circuits. At its first meeting, the company's board of directors resolved to issue 90,000 shares of its common stock to its company president, and 66,000 shares to the company underwriter. The board also voted to sell an additional 264,000 shares of common stock to seven named individuals, including Alves. All seven became company employees.

Alves joined the company as vice-president for finance and administration. As part of an employment and stock purchase agreement dated May 22, 1970, the company agreed to sell Alves 40,000 shares of common stock at ten cents per share "in order to raise capital for the Company's initial operations while at the same time providing the Employee with an additional interest in the Company...." 79 T.C. at 867. The six other named individuals signed similar agreements on the same day. The agreement divided Alves's shares into three categories: one-third were subject to repurchase by the company at ten cents per share if Alves left within four years; one-third were subject to repurchase if he left the company within five years; and one-third were unrestricted. In addition, the company retained an option to repurchase up to one-half of the shares for their fair market value at any time between July 1, 1973 and July 1, 1975.

In transactions not at issue here, Alves sold some of his shares to friends and relatives. In 1973 he sold 4,667 four-year shares to Technology Ventures, Inc. (TVI), the assignee of General Digital's repurchase option, for $18 per share, and in 1974 he sold TVI 2,240 five-year shares for $4 per share.[2]

On July 1, 1974, when the restrictions on the four-year shares lapsed, Alves still owned 4,667 four-year shares that had a fair market value at that time of $6 per share. On March 24, 1975, the restrictions on the 7,093 remaining five-year shares lapsed with the fair market value at $3.43 per share.

Although Alves reported the $8,736 of gain on the sale of the 2,240 five-year shares to TVI as ordinary income on his 1974 tax return, he did not report the difference between the fair market value of the four and five-year shares when the restrictions ended, and the purchase price paid for the shares. The Commissioner treated the difference as ordinary income in 1974 and 1975, pursuant to section 83(a).[3]

In proceedings before the Tax Court, the parties stipulated that: (1) General Digital's common stock had a fair market value of 10 cents per share on the date Alves entered into the employment and stock purchase agreement; (2) the stock restrictions were imposed to "provide some assurance that key personnel would remain with the company for a number of years;" (3) Alves did not make an election under section 83(b) when the restricted stock was received; (4) the free shares were not includable in gross income under section 83; and (5) the four and five-year restricted shares were subject to a substantial risk of forfeiture until July 1, 1974, and March 24, 1975, respectively.

The Tax Court sustained the Commissioner's deficiency determination. It found as a matter of fact that the stock was transferred to Alves in connection with the performance of services for the company, and, as a matter of law, that section 83(a) applies even where the transferee paid full fair market value for the stock. 79 T.C. at 874, 878.

## DISCUSSION

Resolution of the legal issue presented here requires an understanding of section 83's background and operation. Congress enacted section 83 in 1969 in response to the existing disparity between the tax

2. No claim is made here with regard to any section 83 income Alves may have received during the 1973 tax year.

3. In his Tax Court petition, Alves claimed error in reporting as ordinary income the $8,736 gain on the 2,240 five-years shares sold to TVI in 1974. Our disposition here necessarily resolves that issue.

treatment of restricted stock plans and other types of deferred compensation arrangements. S.Rep. No. 552, 91st Cong., 1st Sess. 120–21, *reprinted in* 1969 U.S.Code Cong. & Ad.News 2027, 2150–51 (Senate Report). Prior to 1969, an individual purchasing restricted stock was taxed either when the restrictions lapsed or when the stock was sold in an arm's length transaction. Tax was imposed upon the difference between the purchase price and the fair market value at the time of transfer or when the restrictions lapsed, whichever was less. *See Cohn v. Commissioner*, 73 T.C. 443, 446 (1979). This had both tax deferral and tax avoidance advantages over, for example, employer contributions to an employee's pension or profit sharing trust, which were immediately taxable in the year of receipt. H.R.Rep. No. 413, 91st Cong., 1st Sess. 86–87, *reprinted in* 1969 U.S.Code Cong. & Ad.News 1645, 1733–34 (House Report); Senate Report at 120–21, *reprinted in* 1969 U.S.Code Cong. & Ad. News 2027, 2150–51.

Section 83 resolved this disparity by requiring the taxpayer either to elect to include the "excess" of the fair market value over the purchase price in the year the stock was transferred, or to be taxed upon the full amount of appreciation when the risk of forfeiture was removed. 26 U.S.C. §§ 83(a), 83(b). *See generally* Sobeloff, *Payment of Compensation in the Form of Restricted Property: Problems of Employer and Employee—The Rules of New Code Section 83*, 28 Inst. on Fed. Tax'n 1041, 1042–43 (1970). By its terms, the statute applies when property is: (1) transferred in connection with the performance of services; (2) subject to a substantial risk of forfeiture; and (3) not disposed of in an arm's length transaction before the property becomes transferable or the risk of forfeiture is removed. In the present case, it is undisputed that the stock in question was subject to a substantial risk of forfeiture, that it was not disposed of before the restrictions lapsed, and that Alves made no section 83(b) election. Alves's contention is that because he paid full fair market value for the shares, they were issued as an investment, rather than in connection with the performance of services.

■ The Tax Court concluded that Alves obtained the stock "in connection with the performance of services" as company vice-president. To the extent that this conclusion is a finding of fact, it is not clearly erroneous. *Commissioner v. Duberstein*, 363 U.S. 278, 291, 80 S.Ct. 1190, 1199, 4 L.Ed.2d 1218 (1960); *Rockwell v. Commissioner*, 512 F.2d 882, 884 (9th Cir.), *cert. denied*, 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975). Although payment of full fair market value may be one indication that stock was not transferred in connection with the performance of services, the record shows that until the company sold stock to TVI, it issued stock only to its officers, directors, and employees, with the exception of the shares sold to the underwriter. Alves purchased the stock when he signed his employment agreement and the stock restrictions were linked explicitly to his tenure with the company. In addition, the parties stipulated that the restricted stock's purpose was to ensure that key personnel would remain with the company. Nothing in the record suggests that Alves could have purchased the stock had he not agreed to join the company.

Alves maintains that, as a matter of law, section 83(a) should not extend to purchases for full fair market value. He argues that "in connection with" means that the employee is receiving compensation for his performance of services. In the unusual situation where the employee pays the same amount for restricted and unrestricted stock, the restriction has no effect on value, and hence, Alves contends, there is no compensation.

The plain language of section 83(a) belies Alves's argument. The statute applies to all property transferred in connection with the performance of services. No reference is made to the term "compensation." Nor is there any statutory requirement that property have a fair market value in excess of the amount paid at the time of transfer. Indeed, if Congress intended section 83(a)

to apply solely to restricted stock used to compensate employees, it could have used much narrower language. Instead, Congress made section 83(a) applicable to all restricted "property," not just stock; to property transferred to "any person," not just to employees; and to property transferred "in connection with ... services" not just compensation for employment. *See Cohn v. Commissioner,* 73 T.C. 443, 446–47 (1979); *Armantrout v. Commissioner,* 67 T.C. 996, 1007–08 (1977), *aff'd,* 570 F.2d 210 (7th Cir.1978) (per curiam). As the Second Circuit has noted, Congress drafted section 83(a) as a "blanket rule" in an effort to create "a workable, practical system of taxing employees' restricted stock options." *Sakol v. Commissioner,* 574 F.2d 694, 699–700 (2d Cir.) *cert. denied,* 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 168 (1978).

Section 83's legislative history also reveals that while Congress was concerned primarily with the favorable tax treatment afforded restricted stock plans, it also was concerned that such plans were a means of allowing key employees to become shareholders in businesses without adhering to requirements in other sections of the Code. The Senate Report stated:

> To the extent that a restricted stock plan can be considered a means of giving employees a stake in the business, the committee believes the present tax treatment of these plans is inconsistent with the specific rules provided by Congress in the case of qualified stock options, which were considered by Congress as the appropriate means by which an employee could be given a shareholder's interest in the business.

Senate Report at 120–21, *reprinted in* 1969 U.S.Code Cong. & Ad.News 2027, 2152. *Accord* House Report at 90, *reprinted in* 1969 U.S.Code Cong. & Ad.News 1645, 1735. The legislative history reveals that Congress perceived restricted stock as more than a problem of deferred compensation. It also demonstrates that Congress

intended section 83 to apply to taxpayers like Alves who allege that they purchased restricted stock as an investment.

Alves suggests that the language of section 83(b) indicates that Congress meant for that section to apply only to bargain purchases and that section 83(a) should be interpreted in the same way. Section 83(b) allows taxpayers to elect to include as income in the year of transfer "the excess" of the full fair market value over the purchase price. Alves contends that a taxpayer who pays full fair market value would have "zero excess," and would fall outside the terms of section 83(b).

Section 83(b), however, is not a limitation upon section 83(a). Congress designed section 83(b) merely to add "flexibility," not to condition section 83(a) on the presence or absence of an "excess." Senate Report at 123, *reprinted in* 1969 U.S.Code Cong. & Ad.News 2027, 2154.

■ Moreover, nothing in section 83(b) precludes a taxpayer who has paid full market value for restricted stock from making an 83(b) election. Treasury Regulations promulgated in 1978 and made retroactive to 1969 [4] specifically provide that section 83(b) is available in situations of zero excess:

> If property is transferred ... in connection with the performance of services, the person performing such services may elect to include in gross income under section 83(b) the excess (if any) of the fair market value of the property at the time of transfer ... over the amount (if any) paid for such property .... *The fact that the transferee has paid full value for the property transferred, realizing no bargain element in the transaction, does not preclude the use of the election as provided for in this section.*

26 C.F.R. § 1.83.2(a) (1983) (emphasis supplied). These regulations are consistent with the broad language of section 83 and, as the Tax Court stated, simply make

---

4. Treas.Reg. § 1.83.8(b)(1) (1983). The Commissioner has statutory authority under 26

U.S.C. § 7805(b) to prescribe the retroactivity of regulations.

"more explicit a fact which is inherent in the statute itself." 79 T.C. at 877–78 n. 7. *See Fulman v. United States*, 434 U.S. 528, 533, 98 S.Ct. 841, 845, 55 L.Ed.2d 1 (1978).

Alves last contends that since every taxpayer who pays full fair market value for restricted stock would, if well informed, choose the section 83(b) election to hedge against any appreciation, applying section 83(a) to the unfortunate taxpayer who made no election is simply a trap for the unwary. The tax laws often make an affirmative election necessary. Section 83(b) is but one example of a provision requiring taxpayers to act or suffer less attractive tax consequences. A taxpayer wishing to avoid treatment of appreciation as ordinary income must make an affirmative election under 83(b) in the year the stock was acquired.

Other courts have considered and rejected even stronger attacks on the broad application of section 83. *See Pledger v. Commissioner*, 641 F.2d 287 (5th Cir.), *cert. denied*, 454 U.S. 964, 102 S.Ct. 504, 70 L.Ed.2d 379 (1981); *Sakol v. Commissioner*, 574 F.2d 694 (2d Cir.), *cert. denied*, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 168 (1978); *Cohn v. Commissioner*, 73 T.C. 443 (1979); *Cassetta v. Commissioner*, 39 T.C.M. (CCH) 188 (1979). As the Second Circuit pointed out, Congress was "solving a practical problem, by making a 'gross accommodation to the economic reality.'" *Sakol v. Commissioner*, 574 F.2d at 700, *quoting Fraser v. Commissioner*, 25 F.2d 653, 655 (2d Cir.1928) (L. Hand, J.). In the present case, the statutory language, legislative history, applicable regulations and the consistent refusal of courts to create exceptions to the statute's coverage, all compel the conclusion that section 83(a) applies to the income Alves received when the restrictions on his stock lapsed in 1974 and 1975. The decision of the Tax Court is affirmed.