T.C. Memo. 1996-49



UNITED STATES TAX COURT



ESTATE OF JOSEPH R. CLOUTIER, JOSEPH A. CLOUTIER,
FIDUCIARY, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent



Docket No. 8905-94.                    Filed February 13, 1996.



    C is a corporation whose stock is not listed on an
exchange.  D owned 100 percent of the stock when he
died.  D's stock was valued at $12,582,000 on the
estate's Federal estate tax return.  After R determined
that the stock should have been valued at $15,440,000,
the parties stipulated that the stock was worth
$12,250,000, without regard to any marketability
discount or control premium that would otherwise apply.
The parties' stipulation followed their receipt of
appraisals of the stock's value.  R's sole appraisal
stated that the stock was worth $12,619,000.  F's three
appraisals stated that the stock was worth $11,625,000,
$11,652,555 and $11,850,000, respectively.  In making
these appraisals, none of the appraisers determined the
stock's value by reference to the price of comparable
listed stock.  Held:  Because the stipulated value has
not been shown to be representative of C's "freely
traded value", no discount for marketability is
allowable.

Jon F. Spadorcia, S. Douglas Trolson, and Robert J. Milford, for petitioner.

Russell D. Pinkerton, for respondent.


## MEMORANDUM OPINION

LARO, Judge:  The Estate of Joseph R. Cloutier, Joseph A. Cloutier, Fiduciary, petitioned the Court to redetermine respondent's determination of a $1,212,230 deficiency in the Federal estate tax of the Estate.  Following concessions, we must decide whether a discount for lack of marketability applies to the stipulated value of stock owned by the Decedent at the time of his death, and, if so, the amount of this discount.[1]  We hold that no discount applies.  Unless otherwise indicated, section references are to the Internal Revenue Code in effect as of the date of the Decedent's death.  Rule references are to the Tax Court Rules of Practice and Procedure.  We refer to Joseph R. Cloutier as the Decedent.  We refer to the Decedent's estate as

---

[1] At trial, the Fiduciary made an oral motion that the Court seal the record as to financial information concerning the Estate.  We did not rule on the Fidiciary's motion at that time, taking the matter under advisement pending release of our Memorandum Opinion herein. The oral motion to seal the record will be denied.  Official records of this Court are open to the public for inspection, Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 567-568 (1980), unless a moving party shows that sufficient countervailing interests outweigh the public interest in access, Willie Nelson Music Co. v. Commissioner, 85 T.C. 914, 917-920 (1985).  Petitioner has failed to make such a showing. See Estate of Murphy v. Commissioner, T.C. Memo. 1990-346.

the Estate.  We refer to the Estate's fiduciary (Joseph A. Cloutier) as the Fiduciary.

## Background

The stipulations and attached exhibits are incorporated herein by this reference.  The Decedent died on December 11, 1989, while a resident of Indiana.  The Fiduciary, a resident of Indiana when he petitioned the Court, filed a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, on behalf of the Decedent's estate.  Form 706 reflects the Fiduciary's election of an alternate valuation date under section 2032.  The alternate valuation date is June 11, 1990.

Corporation for General Trade (CGT) is a corporation whose stock is not listed on an exchange.  CGT's stock was entirely owned by the Decedent when he died.  CGT's principal asset at the time of the Decedent's death was 100 percent of the stock of Thirty-Three, Inc. (Thirty-Three).  Thirty-Three owned and operated the NBC television affiliate in Fort Wayne, Indiana.[2] Other assets of CGT at the time of the Decedent's death included rental real estate and a motor home.

On the Form 706, the Decedent's CGT stock was valued at $13,969,000 on the date of his death, and $12,582,000 on the alternate valuation date.  These values were based on two

---

[2] After the Decedent died, but before the alternate valuation date, Thirty-Three was merged into CGT, so that only CGT existed on the alternate valuation date.

appraisals, neither of which is in the record and neither of which included a marketability discount. Respondent determined that the Decedent's CGT stock was worth $15,440,000 on the alternate valuation date. The parties have since stipulated that the June 11, 1990, value of the Decedent's CGT stock was $12,250,000, without regard to any marketability discount or control premium that may otherwise apply. The parties' stipulation followed their receipt of appraisals of the stock's value as of June 11, 1990. Respondent's sole appraisal stated that the stock was worth $12,619,000. Petitioner's three appraisals stated that the stock was worth $11,625,000, $11,652,555 and $11,850,000, respectively.

In making these appraisals, all of the appraisers relied primarily upon transactional and financial data compiled by Paul Kagan Associates, Inc. (Kagan), and none of the appraisers determined CGT's value by reference to the price of stock that was listed on a public exchange. The transactions reported by Kagan included recent transactions in which stock of television stations was transferred at arm's length. All of the appraisers also considered the nature of CGT, its history, its position in the industry, its economic outlook, and other factors listed in Rev. Rul. 59-60, 1959-1 C.B. 237 (regarding the valuation of stock for Federal estate tax purposes).

## Discussion

We must determine whether a marketability discount applies to the stipulated value of the Decedent's CGT shares, and, if so, the amount of this discount. Respondent determined no marketability discount for the shares and adheres to that position. The Fidiciary included no marketability discount in the value of the CGT shares reported on the Form 706, but he now argues for a 25-percent discount. The Fidiciary must prove the applicability and amount of a marketability discount. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Estate of Gilford v. Commissioner, 88 T.C. 38, 50-51 (1987); see also Mandelbaum v. Commissioner, T.C. Memo. 1995-255.

Property includable in a decedent's gross estate is included at its fair market value on either: (1) The date of the decedent's death or (2) the alternate valuation date as provided under section 2032. Secs. 2031(a) and 2032(a); sec. 20.2031-1(b), Estate Tax Regs. Fair market value is a question of fact. Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. National Grocery Co., 304 U.S. 282, 294 (1938). Fair market value represents the price that a willing buyer would pay a willing seller, both persons having reasonable knowledge of all relevant facts and neither person under a compulsion to buy or to sell. Sec. 20.2031-1(b),

Estate Tax Regs.; see also United States v. Cartwright, 411 U.S. 546, 551 (1973); Estate of Hall v. Commissioner, 92 T.C. 312, 335 (1989).  The willing buyer and the willing seller are hypothetical persons, instead of specific individuals or entities, and the characteristics of these hypothetical persons are not necessarily the same as the personal characteristics of the actual seller or a particular buyer.  Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981); Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990).

Special rules govern the valuation of corporate stock, depending on whether the stock is listed on an established securities market.  When stock is so listed, its value usually equals its listed market price.  When stock is not listed on an established market, its value is usually based on the arm's-length sales (if any) of the unlisted stock that have occurred within a reasonable time of the valuation date. Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); Duncan Indus., Inc. v. Commissioner, 73 T.C. 266, 276 (1979). In the absence of recent arm's-length sales, the value of unlisted stock should be determined by taking into account the value of listed stock of corporations engaged in the same or a similar line of business.  Sec. 2031(b); Estate of Hall v. Commissioner, supra at 336.  Unlisted stock must also be valued

indirectly by reference to the subject corporation's net worth, its prospective earning power, its dividend-earning capacity, its goodwill, its management, its position in the industry, the economic outlook for its industry, and the degree of control represented by the block of its stock to be valued.  See Estate of Hall v. Commissioner, supra at 336; Estate of Andrews v. Commissioner, supra at 940; sec. 20.2031-2(f), Estate Tax Regs.; see also Estate of Lauder v. Commissioner, T.C. Memo. 1994-527.

When determining the value of unlisted stock by reference to the value of listed stock, a discount from the listed value is typically warranted in order to reflect the lack of marketability of the unlisted stock.  Mandelbaum v. Commissioner, supra.  Such a discount, namely, a "lack of marketability discount" (or, more succinctly, a "marketability discount"), generally reflects the absence of a recognized market for closely held stock and accounts for the fact that closely held stock is generally not readily transferable.  See Estate of Hall v. Commissioner, supra; Estate of Gilford v. Commissioner, supra.  A marketability discount also reflects the fact that a buyer may have to incur a subsequent expense to register the unlisted stock for public

sale.[3]   See <u>Estate of Hall v. Commissioner</u>, <u>supra</u>; <u>Estate of Gilford v. Commissioner</u>, <u>supra</u>.

Petitioner relies primarily on the testimony and report of its expert witness, R. James Alerding, to support its claim that it is entitled to discount the parties' stipulated value for the subject shares' lack of marketability.  Mr. Alerding concluded that petitioner may discount his appraised values by 25 percent for the shares' lack of marketability.  Mr. Alerding reached his conclusion, in the main, by attempting to apply the factors recently set forth in <u>Mandelbaum v. Commissioner</u>, <u>supra</u>.

While expert testimony can sometimes aid the Court in evaluating a claim, we need not follow an expert's opinion when it is contrary to our judgment.  We may reject an expert's opinion in its entirety whenever we believe it is appropriate to do so.  <u>Helvering v. National Grocery Co.</u>, <u>supra</u> at 294-295; <u>Estate of Kreis v. Commissioner</u>, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139.  With respect to the opinion of Mr. Alerding, we believe that it is appropriate to do so.  His report and testimony are unhelpful to the Court, and we find both to be unpersuasive.  In contrast to the detailed reports that we

---

[3] In certain cases, a buyer's registration costs may be minimal.  For example, registration costs may be minimal to the buyer if he or she has the right to compel the corporation to register (or otherwise "piggyback") the unlisted shares at its expense.

typically see with respect to an expert's opinion of valuation, Mr. Alerding's report is three pages long and consists mainly of bald assertions that a 25-percent marketability discount is warranted. His report contains no meaningful discussion of any of the factors of valuation; it does not reflect a review of basic information necessary to render an opinion on valuation; and it shows undue reliance on appraisals performed by third parties. As a point of fact, one of the appraisals on which Mr. Alerding purported to rely was merely a draft of an appraisal, and Mr. Alerding never spoke to the author concerning the author's completion of that draft or about any of the information contained therein.

Mr. Alerding also relied on studies of property that was not comparable to the subject property in order to form a "benchmark" on which to base his conclusion concerning the amount of a marketability discount. He failed to evaluate properly whether the Decedent's 100-percent interest in CGT merited a premium for control, or whether such a premium (if one existed) would neutralize his proffered marketability discount.[4] He focused

---

[4] The Court has often determined a control premium in the case of a majority interest. See, e.g., Estate of Trenchard v. Commissioner, T.C. Memo. 1995-121, and the cases cited therein. A control premium reflects a shareholder's ability to control a corporation through his or her dictation of its policies, procedures, or operations. Estate of Chenoweth v. Commissioner,

(continued...)

exclusively on the hypothetical buyer, to the exclusion of the hypothetical seller. In this latter regard, we find unpersuasive Mr. Alerding's conclusion that a willing seller of a 100-percent interest in CGT would have to discount the value of that interest by 25 percent for lack of marketability. See <u>Mandelbaum v. Commissioner</u>, T.C. Memo. 1995-255; <u>Moore v. Commissioner</u>, T.C. Memo. 1991-546.

We also note that Mr. Alerding has limited experience with respect to the valuation at hand. In response to questions from the Court, Mr. Alerding acknowledged that he had <u>no</u> experience in valuing television station property, and that he had reached his conclusion without direct reference to similar publicly traded property or stock. Although a marketability discount may apply in some cases where 100 percent of the stock of an unlisted corporation is held by one shareholder, a discount for lack of marketability is inapplicable when the value of the unlisted stock is not determined by reference to the price of listed stock.[5] This is a key point that Mr. Alerding missed when he

---

[4] (...continued)
88 T.C. 1577, 1589 (1987); <u>Estate of Trenchard v. Commissioner</u>, <u>supra</u>; accord Rev. Rul. 59-60, 1959-1 C.B. 237, 242 (controlling interest in closely held company may command a higher price than a minority interest).

[5] As we understand the thrust of Mr. Alerding's thinking with respect to marketability discounts, the value of a single asset is significantly reduced by a lack of marketability
(continued...)

attempted to apply our <u>Mandelbaum</u> analysis to the facts herein. In <u>Mandelbaum v. Commissioner</u>, <u>supra</u>, the parties stipulated the freely traded value of the corporation's shares, and we were asked to determine the marketability discount that applied to that value. In the instant case, by contrast, the parties have given us a stipulated value that neither party claims is the subject stock's freely traded value.[6] Thus, we find that a strict application of the <u>Mandelbaum</u> analysis is out of place in the instant case.

The bottom line to this case is that petitioner asks us to determine a marketability discount with respect to a value that does not represent the stock's freely traded value. This we will not do. It is inappropriate to discount the value of the stock for a lack of marketability in these circumstances. The discount is confined to property that is being valued by reference to prices paid for assertedly comparable property.

---

[5] (...continued) whenever the asset is transferred to a corporation that is wholly owned by a single shareholder. To such a broad proposition, we do not agree. Suffice it to say that a marketability discount may be appropriate in such a case, but only to account for the difference between the value of the shareholder's stock and the freely traded value of otherwise comparable stock that is listed on an exchange.

[6] Indeed, in response to a question from the Court at trial, petitioner's counsel acknowledged that the stipulated value was merely a conciliatory amount that the parties reached following their review of the appraisals.

Because the record does not show that a marketability discount applies to the stipulated value of the Decedent's CGT shares, we hold that no discount for marketability is allowable.[7] In so holding, we have considered all arguments made by petitioner, and, to the extent not discussed above, have found them to be without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

---

[7] Respondent argues that the fact that the Decedent controlled CGT means that a control premium exists to the extent of any marketability discount. Based on our holding, we need not, and do not, address this argument.