T.C. Memo. 2011-286

UNITED STATES TAX COURT

ALLEN L. DAVIS, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 24329-06, 2757-07,    Filed December 12, 2011.
2758-07, 2759-07.

<u>Jeffrey H. Paravano</u>, <u>David J. Fischer</u>, <u>Samuel R. Linsky</u>, <u>Ted T. Martin</u>, <u>Michael K. Gall</u>, <u>Benjamin G. Dusing</u>, and <u>Robert Razzano</u>, for petitioner in Docket No. 24329-06.

<u>Kenneth W. Gideon</u>, <u>Albert H. Turkus</u>, <u>Julia M. Kazaks</u>, <u>Daniel P. Phillips</u>, <u>Arnette A. Steele</u>, and <u>Melissa L. Galetto</u>, for petitioners in Docket Nos. 2757-07, 2758-07, and 2759-07.

---

[1]This case is consolidated for purposes of trial, briefing, and opinion with the cases of J. David and Dianne M. Rosenberg, Docket No. 2757-07, Jared A. and Bridget Davis, Docket No. 2758-07, and A. David and Tracy Davis, Docket No. 2759-07.

Gretchen Ann Kindel, Dawn Danley-Nichols, Robin Harrell, and Matthew J. Fritz, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, Judge:  Respondent issued petitioners "whipsaw"[2] deficiency notices determining deficiencies in their Federal income tax for 2004.  Specifically, respondent determined a $13,732,288 deficiency with respect to Allen L. Davis (Allen), a $273,311 deficiency with respect to J. David Rosenberg (Rosenberg) and Dianne M. Rosenberg, a $4,793,758 deficiency with respect to Jared A. Davis (Jared) and Bridget Davis and a $4,793,759 deficiency with respect to A. David Davis (David) and Tracy Davis.

Petitioners are shareholders of CNG Financial Corporation (CNG), an S corporation.  The controversy in these cases concerns an option that CNG granted to Allen in 2002.  There are two issues for decision.  The first issue is what amount, if any, Allen must include in his gross income as a result of his

---

[2]A "whipsaw" is often a situation where deficiency notices are issued to parties on both sides of a transaction who have treated the same item of the transaction inconsistently, typically including an item in income for one taxable entity and allowing a deduction for the other.  The alternative position in each of the respective deficiency notices is that there is no income and no deduction.  Ultimately, the deficiency falls upon the party that is unsuccessful.  In this situation, the Commissioner is more like a stakeholder between the two parties.

exercise of the option in 2004. We hold that he must include $36,962,694 in gross income. The second issue is whether the company may deduct the same amount as reasonable compensation. We hold it may.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated by this reference. When the petitions were filed, Allen resided in Florida, and all other petitioners resided in Ohio.

CNG operates a "payday" loan[3] business through its subsidiary, Check-N-Go, Inc.[4] Jared founded CNG[5] in 1994 with the proceeds of a $100,000 loan from his parents, Allen and Judith Davis (Judith). During the company's infancy, Allen also informally advised Jared in the operation of the business. In 1995, Jared's brother David and his sister Laura Davis Klekamp (Laura) acquired stock in CNG. David also joined CNG as an

_____

[3]A "payday" loan is a short-term loan agreement in which the borrower issues the lender a postdated check in the amount of the loan principal plus a finance charge. When the loan becomes due, the lender deposits the borrower's check. These loans carry an effective interest rate that is exorbitant, but borrowers are typically compelled to accept the interest rate because they are usually economically vulnerable.

[4]For the sake of simplicity, we refer to both CNG Financial Corporation and Check-N-Go, Inc. as CNG.

[5]The company was originally named Check Mart, Inc. and was renamed Check-N-Go, Inc. a year later.

officer and a director and became involved in the company's management. At all relevant times, CNG's stock was not traded on an established securities market.

CNG enjoyed great success from the start and sought to aggressively expand its operations. To do this, CNG required a large infusion of cash, and it obtained financing from several banks and from Allen. In return for Allen's loans, Jared and David gave Allen options to purchase from each of them 188.86 shares of CNG stock (the 1997 options).[6] Allen promised David that he would not exercise the 1997 options unless he experienced financial distress.

In 1997 Jared, David, Laura and Allen also entered into a stock transfer restriction agreement that, in the event of certain attempted transfers of CNG stock by a CNG shareholder, gave the other shareholders a right of first refusal to purchase the stock at net book value. The list of triggering events included a forced sale pursuant to a divorce decree or other legal process.

In May 1998 Allen retired as president and chief executive officer (CEO) of Provident Financial Group (Provident). By that time, he had been Provident's president for 14 years.

---

[6]The 377.72 shares represented a 23-percent interest in the company.

In January 2000 Allen exercised the 1997 options, acquiring 23 percent of CNG's stock.  He also entered into a voting trust agreement with Jared that enabled him to vote Jared's shares, which represented a 33.5-percent ownership interest.  He asked David to enter into a similar voting trust agreement, but David refused.  Allen consequently used his majority control to remove David from the board and elect himself president, CEO and chairman of the board.

In August 2000, CNG entered into a $70 million revolving credit facility agreement (credit agreement) with a bank syndicate led by National City Bank (the bank group).  The bank group agreed to extend CNG credit in large part because of Allen's extensive experience in the banking industry at Provident, and the bank group therefore insisted on Allen's continued involvement in the company.  The credit agreement thus required Allen's participation in the day-to-day management of CNG.  The credit agreement also required CNG to obtain $10 million of additional external financing.  CNG satisfied this requirement by borrowing $5 million each from Rosenberg (a friend of the Davis family) and the Huntington Capital Investment Company.  In connection with his loan, Rosenberg received a warrant to purchase CNG stock.

Allen resigned as an officer and director of CNG at the end of 2000 but continued to serve as an independent consultant to

the company from January 2001 to December 2004. While he was a consultant, he continued to participate in the day-to-day management of CNG. Jared replaced Allen as CNG's president and CEO in April 2001.

Judith filed for divorce from Allen in August 2001 and claimed she was entitled to half of Allen's CNG shares. Allen threatened, on numerous occasions, to leave CNG if his ownership interest was reduced, which would have put CNG in a default position with respect to the credit agreement. Judith nevertheless filed a motion asking the divorce court to order Allen to immediately transfer half of his shares to her.

The divorce was acrimonious and created strife within the family. Jared used Judith's motion as an opportunity to push Allen and Judith to reach a marital settlement agreement. To that end, Jared filed a complaint in an Ohio State court seeking a declaratory judgment that Judith's motion had triggered his first refusal right under the share transfer restriction agreement and asking the court to specifically enforce that right by ordering Allen to sell him all of Allen's shares at book value. Because the forced sale would have substantially devalued the marital estate, Allen and Judith ultimately agreed to Jared's plan to resolve the family conflict (Jared's plan) in late December 2002.

Under Jared's plan, Allen transferred half of his CNG shares to Judith, subject to an option allowing Allen to repurchase the shares for $16 million (the Judith Option). CNG then redeemed the 188.86 shares from Judith and amended the Judith Option (the Allen Option) by adding a cashless exercise provision. The cashless exercise provision allowed Allen to avoid paying any portion of the exercise price and to instead receive a number of shares (determined according to a formula) that were worth $16 million less than the value of 188.86 shares. The Allen Option was not transferable. Also as part of Jared's plan, Laura sold her 10-percent interest in CNG to Allen, and the voting trust agreement between Allen and Jared was rescinded.

The redemption reduced the number of outstanding shares of CNG stock from 1,642.25 to 1,453.39. Jared, David and Allen were left with ownership interests of 37.85 percent, 37.85 percent and 24.3 percent, respectively. CNG made distributions to Jared, David and Allen in proportion to these percentages from 2003 to August 2004.

At the end of 2002 CNG had 834 stores, revenues of $199.3 million and earnings before interest, taxes, depreciation and amortization (EBITDA) of $44.6 million. By the end of June 2004, CNG had 1,106 stores, revenues of $272.7 million and EBITDA of $62.3 million. At the end of July 2004 CNG had an equity value of approximately $460.5 million.

In 2004 CNG anticipated an amendment of the credit agreement with the bank group that would allow CNG to distribute $50 million to its shareholders. To take part in this distribution, Allen exercised the Allen Option through the cashless exercise provision in early August 2004 and received 131.8055 shares of CNG stock.[7] Similarly, Rosenberg exercised his warrant in September 2004 and received 140 shares of CNG stock.[8] The credit agreement was subsequently amended to increase CNG's line of credit to $150 million and to remove the covenant that required Allen to be involved in the day-to-day management of CNG.

CNG treated the stock as compensation to Allen, and Rosenberg, Jared and David (collectively, the CNG parties) each claimed their share of the company's $36,962,694 compensation deduction on their returns for 2004.[9] Allen, on the other hand,

---

[7]In July 2004 CNG split its existing (old) stock into a class of voting common (voting) stock and a class of non-voting common (non-voting) stock. Each outstanding share of the old stock was split into one share of voting stock and 0.25 shares of non-voting stock. When he exercised the Allen Option, Allen received 131.8055 shares of voting stock and 3.2951 shares of non-voting stock. Because he received the equivalent of 131.8055 shares of the old stock, for the sake of simplicity we will treat him as having received the old stock and disregard the stock split.

[8]Rosenberg received 140 shares of voting stock and 3.5 shares of non-voting stock.

[9]CNG apparently issued and kept as treasury stock the 57.0545 shares that Allen did not receive as a result of the cashless exercise provision, leaving it with 1,642.25 shares outstanding. Otherwise, CNG would have had 1,585.1955 shares

(continued...)

did not treat the Allen Option's exercise as taxable and did not include the stock's value in his gross income for 2004.

OPINION

We are asked to decide whether the exercise of the Allen Option resulted in gross income to Allen. If we decide that it does, we must then decide whether any of that amount is deductible by CNG as reasonable compensation.

## I. Allen's Receipt of CNG Stock

When property is transferred in connection with the performance of past, present or future services, a taxpayer must include in gross income the excess of the property's fair market value over the amount paid for the property. Sec. 83(a);[10] sec. 1.83-3(f), Income Tax Regs. In the case of options without a readily ascertainable fair market value, section 83 applies to the stock received upon exercise of the options rather than at the time of receipt. See sec. 83(e)(3) and (4); sec. 1.83-7(a), Income Tax Regs. If an option is not traded on an established market, the option's value is not readily ascertainable when the option is non-transferable. See sec. 1.83-7(b)(2)(i), Income Tax Regs.

_____

[9](...continued)
outstanding, and the 131.8055 shares Allen received would have been worth approximately $38,293,311.

[10]All section references are to the Internal Revenue Code in effect for the year at issue, unless otherwise indicated.

The parties disagree as to whether the CNG stock Allen received in 2004 was transferred in connection with the performance of services.  The CNG parties argue that it was.  Allen and respondent argue that it was not.  If we find that it was, we must then determine the stock's value.

A.  Whether the Stock Was Transferred in Connection With the Performance of Services

We first address the standard of proof.  Allen contends that the Allen Option does not, in form, appear to have been granted in connection with the performance of services, and therefore, that the strict proof requirement of the Danielson rule[11] prevents the CNG parties from showing otherwise.  Alternatively, Allen contends that, if the Danielson rule does not apply, the

---

[11]Under the Danielson rule, a party to an agreement can challenge the Commissioner's interpretation of the agreement's tax consequences only by producing proof which in an action between the parties to the agreement would be admissible to alter the construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc.  Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965).  The Courts of Appeals for the Sixth and Eleventh Circuits, to which appeals in these cases would lie, have adopted the Danielson rule.  See Plante v. Commissioner, 168 F.3d 1279, 1280-1282 (11th Cir. 1999), affg. T.C. Memo. 1997-386; N. Am. Rayon Corp. v. Commissioner, 12 F.3d 583, 587-588 (6th Cir. 1993), affg. T.C. Memo. 1992-610.

"strong proof" rule[12] applies instead.  We disagree with both contentions.

We have held that the Danielson rule does not apply when, as in these cases, both parties to an agreement are before the Court and the Commissioner does not object to the presentation of evidence varying the terms of the agreement.  See Freeport Transp. Inc. v. Commissioner, 63 T.C. 107, 115-116 (1974).  The "strong proof" rule also does not apply here because, contrary to Allen's contention, the terms of the written option agreement indicate that the Allen Option was granted in connection with the performance of services, as we discuss below.  Thus, respondent seeks to overcome the form of the agreement, and the "strong proof" rule does not apply to respondent.  See Estate of Durkin v. Commissioner, 99 T.C. 561, 573 (1992).  Because the Danielson rule and the "strong proof" rule do not apply, we decide these cases on the preponderance-of-the-evidence standard.

We now turn to the characterization of the Allen Option. Whether property was transferred in connection with the performance of services is a question of fact.  Centel Commc'ns Co. v. Commissioner, 92 T.C. 612, 627 (1989), affd. 920 F.2d 1335 (7th Cir. 1990).  Property does not necessarily have to be

_____

[12]The "strong proof" rule requires a party seeking to overcome the form of an agreement to present "strong proof" that the terms of the written instrument do not reflect the contracting parties' actual intentions.  Estate of Durkin v. Commissioner, 99 T.C. 561, 572-573 (1992).

transferred as "compensation" to trigger section 83.  <u>MacNaughton v. United States</u>, 888 F.2d 418, 421 (6th Cir. 1989); <u>Alves v. Commissioner</u>, 734 F.2d 478, 481-482 (9th Cir. 1984), affg. 79 T.C. 864 (1982).  The statute applies as long as there is some relationship between the services performed and the property transferred, even if additional reasons for the transfer (e.g., to give an employee a stake in the business) are present.  See <u>Alves v. Commissioner</u>, 79 T.C. 864 (1982), affd. 734 F.2d 478 (9th Cir. 1984); <u>Montelepre Systemed, Inc. v. Commissioner</u>, T.C. Memo. 1991-46, affd. 956 F.2d 496 (5th Cir. 1992).

Here, the CNG stock was transferred to Allen in connection with his performance of services because CNG granted the Allen Option with the intention of securing Allen's participation in the day-to-day management of CNG.  Allen threatened to leave CNG, which would have caused CNG to be in default of the credit agreement with the bank group.  CNG needed the financing provided by the bank group to continue its rapid expansion.  Jared credibly testified that the Allen Option was granted to induce Allen to stay.  The option agreement itself provides objective evidence of CNG's intent, as the agreement contains a provision that required Allen to notify CNG in writing if he made a section 83(b) election.[13]

---

[13]Section 83(b) allows a person who <u>performs services in connection with the transfer of property</u> to elect to treat the
(continued...)

Because CNG granted the Allen Option to secure Allen's participation in the management of the company, the stock Allen received by exercising that option was transferred in connection with the performance of services. Whether CNG had other reasons for granting the Allen Option does not alter that fact.

B. The Stock's Value

We now turn to the question of the value of the stock. Valuation is a question of fact. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). Determining fair market value is an exercise in judgment on the part of the trier of fact. See Colonial Fabrics, Inc. v. Commissioner, 202 F.2d 105, 107 (2d Cir. 1953), affg. a Memorandum Opinion of this Court. The value we find is determined by considering all of the evidence. See Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Alvary v. United States, 302 F.2d 790, 795 (2d Cir. 1962).

Respondent and the CNG parties contend that the CNG stock's per-share value was established by the Allen Option's cashless exercise provision at approximately $280,434 per share (the $16 million exercise price divided by the 57.0545 shares CNG retained). They therefore argue that the value of the 131.8055 shares Allen received was $36,962,694. For purposes of trial,

_____

[13](...continued)
property as compensation in the year it is received.

Allen hired Alex W. Howard (Howard), senior managing director of Howard Frazier Barker Elliot, Inc., to appraise the value of the shares. Howard reached a $25,31,378.30 value for the shares. We find the value established by the cashless exercise provision to be a better starting point because that value was the product of an arm's-length transaction between Allen and CNG, while the value Allen proposed is a number his expert unilaterally determined for purposes of trial.

Allen next argues that a 30-percent lack-of-marketability discount should be applied to the cashless exercise provision's valuation. We disagree. When determining the value of unlisted stock by reference to the value of listed stock, a discount is typically warranted to reflect the unlisted stock's lack of marketability. Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. without published opinion 91 F.3d 124 (3d Cir. 1996). A lack-of-marketability discount is inappropriate, however, where unlisted stock is not valued by reference to the price of stock listed on a public exchange. Estate of Cloutier v. Commissioner, T.C. Memo. 1996-49. In Estate of Cloutier, the Court found that the price of unlisted stock had not been valued in reference to the price of listed stock because, unlike the situation in Mandelbaum, the parties had stipulated to a value which neither claimed to be the stock's freely traded value. Here, CNG could not have agreed that the price established by the Allen Option

was the stock's freely traded value. Such a valuation would have created a windfall for Allen.

The Allen Option required Allen to pay $16 million in cash to reacquire the 188.86 shares he had transferred to Judith. The option's cashless exercise provision allowed him to effectively pay the $16 million exercise price with $16 million worth of stock instead. According to the formula in the option, this equaled 57.0545 shares at the time the option was exercised.

If, as Allen contends, the cashless exercise provision establishes only a nominal freely traded value for the shares by failing to account for the stock's lack of marketability, then that would mean CNG accepted stock with a real fair market value of $11.2 million ($16 million discounted by 30 percent) as payment of the $16 million exercise price. In other words, CNG would have accepted payment of 70 cents on the dollar. In that case, if CNG had turned around and sold the 57.0545 shares it retained under the cashless exercise provision, that sale would have generated proceeds of only $11.2 million. Looking at it another way, if Allen had instead decided to sell $16 million worth of CNG stock (at a 30-percent discount) and use the proceeds of that sale to pay the $16 million cash exercise price, he would have had to sell approximately 72.1 shares.[14]

---

[14]Before the Allen Option was exercised, CNG stock was worth approximately $316,876.52 per share based on 1,453.39 shares
(continued...)

We do not believe that by adding the cashless exercise provision, CNG intended to reduce the option's exercise price. We therefore find that CNG stock Allen received when he exercised the Allen Option was worth $36,962,694.

C. Conclusion

Allen received the 131.8055 shares of CNG stock in connection with the performance of services. Those shares were worth $36,962,694. Accordingly, Allen must include that amount in gross income for 2004.

II. CNG's Deduction for Reasonable Compensation

We now turn to the question of whether CNG may deduct any portion of the $36,962,694 as reasonable compensation. When property is transferred in connection with the performance of services, an employer may deduct the amount included in the employee's gross income. Sec. 83(h). The deduction is limited to a reasonable amount. Sec. 162(a)(1). Reasonableness is a question of fact, and no single factor is decisive. Kennedy v. Commissioner, 671 F.2d 167, 173 (6th Cir. 1982), revg. 72 T.C. 793 (1980); Mayson Mfg. Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), revg. and remanding a Memorandum Opinion of this Court.

---

14(...continued)
outstanding.

Respondent contends Allen's total compensation for 2002 was unreasonable because it far exceeded the amount other companies in the industry paid their executives that year. Respondent's comparison of Allen's 2002 compensation to the industry standard is not helpful because the event being taxed (and for which CNG is claiming a deduction) is Allen's receipt of CNG stock in 2004.

This is not to say that the events of 2002 are irrelevant. Allen received the stock by exercising the Allen Option, which was granted to him in 2002. It is therefore necessary to address the 2002 grant, but section 162 and the underlying regulations provide no guidance for doing so. Moreover, there is no case precedent that addresses how to ascertain the deductible value of stock received from the exercise of a section 83 option where there is no readily ascertainable value. In the case of contingent compensation agreements, however, contingent compensation that turns out to be greater than the amount ordinarily paid is nevertheless deductible if it was the result of arm's-length or free bargaining. See sec. 1.162-7(b)(2), Income Tax Regs. The Allen Option operated in the same manner as a contingent compensation agreement because the option's cashless exercise provision allowed Allen to receive the appreciation in value on the 188.86 shares he had surrendered without paying any cash. Allen's compensation was thus contingent on CNG's

performance. The better the returns on CNG's business, the more Allen was "paid".

The Allen Option was the product of negotiations and free bargaining, and reasonable compensation was paid to Allen during 2004. Although the family relationship between Allen, David and Jared invites careful scrutiny, that relationship does not necessarily prevent the agreement from being freely entered into and at arm's length. See Kennedy v. Commissioner, supra at 175. An agreement between family members in a closely held corporation will be upheld if it is fair to the corporation in light of all the circumstances. Id.

The Allen Option was granted in an arm's-length transaction because Jared and David had interests adverse to Allen's and did not merely acquiesce to Allen's wishes. Cf. Harolds Club v. Commissioner, 340 F.2d 861 (9th Cir. 1965) (contingent compensation agreement not a free bargain because the employee-father dominated the shareholder-sons), affg. T.C. Memo. 1963-198. By the time the Allen Option was granted, Jared and David were looking out for their own interests. Jared had used the complaint he filed in Ohio State court as leverage to force Allen to relinquish voting control of his shares, and David had an acutely adversarial relationship with Allen. David distrusted Allen from the time he broke his promise not to exercise the 1997 options and removed David from the board. Jared and David also

had interests adverse to Allen's. They had an incentive not to overcompensate Allen because the more he was paid, the less they received. See Rotolo v. Commissioner, 88 T.C. 1500, 1526 (1987).

At the time the agreement was entered into, it was fair to CNG. Allen threatened to leave CNG unless he was given the opportunity to maintain his ownership interest in CNG. CNG, however, needed Allen to secure financing. The bank group extended CNG credit only because of Allen's experience at Provident, and the covenant in the credit agreement required Allen's participation in the day-to-day management of CNG. CNG needed that financing to fuel its exponential expansion.

CNG was exceptionally successful from the time the Allen Option was granted to the time it was exercised. During that period, CNG opened 272 new stores. CNG's revenues increased approximately 37 percent from $199.3 million to $272.7 million, and its EBITDA increased approximately 40 percent from $44.6 to $62.3 million.

This success was mostly attributable to Allen. CNG could not have expanded as quickly as it did without Allen because the covenant requiring Allen's participation in CNG's management was not removed until the credit agreement was renegotiated in September 2004. "An employee responsible for the financial success and growth of a large and complex enterprise is entitled to substantial compensation." Lundy Packing Co. v. Commissioner,

T.C. Memo. 1979-472; see also <u>Albert Van Luit Co. v.</u>
<u>Commissioner</u>, T.C. Memo. 1975-56.

The granting of the Allen Option was reasonable because it was not a one-sided bargain.  See <u>Kennedy v. Commissioner</u>, 671 F.2d at 174.  The option enabled CNG's expansion, and that expansion increased the company's revenues and income not only for the period the option was outstanding, but also for future years.  Jared and David also benefitted from the Allen Option because CNG's success increased the value of their ownership interests.  Under the facts and circumstances of these particular cases, we find that Allen's 2004 compensation was reasonable and hold that CNG is entitled to deduct $36,962,694 as reasonable compensation to Allen in 2004.

In reaching our holdings, we have considered all arguments made, and to the extent not mentioned, we consider them irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>
<u>under Rule 155 in docket No.</u>
<u>24329-06, and decisions will</u>
<u>be entered for petitioners in</u>
<u>docket Nos. 2757-07, 2758-07,</u>
<u>and 2759-07</u>.