[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-10916

_____

Docket No. CIR-1:24329-06

ALLEN L. DAVIS,

Petitioner-Appellant,

versus

COMMISSIONER OF IRS,

Respondent-Appellee.

_____

No. 12-11786

_____

Docket No. CIR-1:2757-07

J. DAVID ROSENBERG,
DIANE M. ROSENBERG,

Petitioners-Appellees,

versus

COMMISSIONER OF IRS,

Respondent-Appellant.

_____

No. 12-11787

_____

Docket No. CIR-1:2758-07

JARED A. DAVIS,
BRIDGET DAVIS,

Petitioners-Appellees,

versus

COMMISSIONER OF IRS,

Respondent-Appellant.


_____

No. 12-11788

_____

Docket No. CIR-1:2759-07

A. DAVID DAVIS,
TRACY DAVIS,

Petitioners-Appellees,

versus

COMMISSIONER OF IRS,

Respondent-Appellant.


2

_____

Petitions for Review of a Decision of the
United States Tax Court

_____

(May 16, 2013)

Before BARKETT, JORDAN, and RIPPLE,[*] Circuit Judges.

RIPPLE, Circuit Judge:

In 2004, Allen Davis exercised an option to purchase additional shares in CNG Financial Corporation ("CNG"), a closely-held corporation. He did not report his exercise of the option as income on his federal income tax return, believing that it had no tax consequences. However, CNG took a deduction for the value of the shares Mr. Davis received through the option's exercise, stating that it issued the option to Mr. Davis in connection with his performance of services. CNG's shareholders, other than Mr. Davis, (the "CNG taxpayers"),[1] claimed their pro rata shares of this deduction on their 2004 federal income tax returns. Because of the transaction's inconsistent tax treatment, the Commissioner

_____

[*] Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

[1] The CNG shareholders other than Mr. Davis are J. David Rosenberg, Jared A. Davis and A. David Davis. Together with their spouses, because they filed joint tax returns, they are the petitioners-appellees in this case.

3

of Internal Revenue (the "Commissioner") issued deficiency notices to Mr. Davis and the CNG taxpayers. Mr. Davis and the CNG taxpayers challenged their respective deficiency notices in the Tax Court.[2] The Tax Court determined that Mr. Davis should have included the value of the shares he received from the option's exercise in his 2004 gross income and sustained the Commissioner's deficiency notice. The Tax Court upheld the CNG taxpayers' deductions. Mr. Davis has timely appealed.[3] To ensure consistent treatment of this transaction, the Commissioner has appealed the Tax Court's decision with respect to the CNG taxpayers. These appeals have been consolidated. For the reasons set forth in this opinion, we affirm the judgment of the Tax Court.

# I

# BACKGROUND

CNG is a subchapter S corporation[4] operating a highly profitable pay-day loan business. CNG is closely held; the shareholders are Mr. Davis and the CNG taxpayers. Mr. Davis is actively involved in CNG's operations and many of

---

[2] The jurisdiction of the Tax Court was predicated on 26 U.S.C. § 7442.

[3] The jurisdiction of this court is predicated on 26 U.S.C. § 7482.

[4] 26 U.S.C. §§ 1361-1379.

4

CNG's essential credit agreements are contingent upon his continued involvement with CNG's management. In 2001, when his former wife, Judith, filed for divorce, Mr. Davis owned twenty-three percent of CNG, and Judith owned no interest in CNG. As part of the couple's divorce property settlement, Judith demanded half of Mr. Davis's CNG shares.

Complying with Judith's demand would have reduced significantly Mr. Davis's ownership of CNG. Mr. Davis was opposed to any dilution of his ownership interest in CNG. He frequently threatened the CNG taxpayers and Judith that he would stop working for the company should his ownership interest be decreased. Mr. Davis's departure from CNG would have been disastrous for the company, because it would have meant the loss of his business expertise and it would have placed CNG in default with respect to key credit agreements. Mr. Davis proposed that CNG issue him an option to purchase enough shares to replace those that he had to give to Judith so that he could maintain his current level of ownership in CNG. In exchange for such an option, Mr. Davis promised that he would continue his involvement with CNG. In response to Mr. Davis's threats and to induce him to remain active in managing CNG, CNG agreed to grant him such an option.

Shortly before the option transaction was completed, Mr. Davis insisted that

5

he receive an option from Judith that would allow him to re-purchase the shares that would be transferred to her.  Mr. Davis could exercise this option by paying sixteen million dollars to Judith.  This was the "Judith Option."

However, Mr. Davis and the CNG taxpayers knew that Judith never intended to keep any CNG shares she received from Mr. Davis; the plan was for CNG to redeem immediately Judith's shares for cash and assume the obligation under the Judith Option to permit Mr. Davis to purchase shares from CNG.  For example, he told his sons David and Jared that CNG would be issuing an option only to him and that whether it went through Judith was irrelevant.[5]  Mr. Davis also admitted that he sought the option for tax avoidance purposes because he believed that the chosen structure would prevent him from having to recognize income from its exercise.[6]

In 2002, as the parties had planned, Mr. Davis simultaneously transferred 188.86 shares of CNG stock to Judith and received the Judith Option in return, and Judith sold the 188.86 shares to CNG.  CNG assumed Judith's obligations under the Judith Option and granted Mr. Davis the right to purchase 188.86 shares from CNG.

---

[5] Additional Record Excerpts ("A.R.E.") 434.

[6] Id. at 859.

Mr. Davis continued his involvement with CNG's operations. Subsequently, CNG and Mr. Davis negotiated several significant modifications to the Judith Option. The resulting option was the "Allen Option." First, the option was amended to include a cashless exercise provision, which enabled Mr. Davis to give up a number of the 188.86 shares equal to sixteen million dollars, as determined by a formula set forth in the Allen Option agreement, and receive the balance of the 188.86 shares. Second, the Allen Option required that Mr. Davis notify CNG in writing if, after exercising the option, he were to make a § 83(b) election, which permits a person receiving property in connection with the performance of services to elect to treat the property as income in the year it is received, even if recognition usually would be deferred. See 26 U.S.C. § 83(b).

Two years later, in 2004, Mr. Davis exercised the Allen Option by using the cashless exercise provision. He received 131.8055 shares. According to the Allen Option's formula, 57.0545 shares were equivalent to sixteen million dollars. CNG determined the value of the shares Mr. Davis received, using the agreed-upon formula, to be $36,962,694. The CNG taxpayers took deductions for the issuance of these shares under 26 U.S.C. § 83(h), which permits a deduction for the

7

payment of reasonable compensation for services rendered.[7] Mr. Davis did not report the value of the shares as income nor did he take a deduction as a CNG shareholder.

Because of the inconsistent tax treatment of Mr. Davis's exercise of the Allen Option, the Commissioner issued "whipsaw" deficiency notices to Mr. Davis and to the CNG taxpayers. Mr. Davis and the CNG taxpayers sought review of the Commissioner's deficiency notices. In the Tax Court, the Commissioner argued that Mr. Davis's exercise of the Allen Option generated ordinary income for him and permitted a corresponding deduction for the CNG taxpayers. In the alternative, the Commissioner argued that Mr. Davis's exercise of the Allen Option generated capital gains income and no corresponding deduction for the CNG taxpayers.[8] The CNG taxpayers urged that their deductions were proper because the Allen Option was granted to Mr. Davis to induce him to continue his key involvement with CNG, making the Allen Option property transferred in connection with the performance of services. Mr. Davis contended that, because the option was given to him by Judith incident to their

---

[7] Because CNG is an S corporation, the deduction flowed through to CNG's shareholders.

[8] Given the Tax Court's reasoning, the Commissioner does not press this alternative characterization of the Allen Option's exercise on appeal, and we do not address it.

8

divorce, his exercise of it was shielded from recognition as income under 26 U.S.C. § 1041.

The Tax Court found that the Allen Option was granted in connection with the performance of services, and its exercise therefore created ordinary income for Mr. Davis under 26 U.S.C. § 83(a). The court observed that Mr. Davis "threatened, on numerous occasions, to leave CNG if his ownership interest was reduced."[9] It also found that "the CNG stock was transferred to [Mr. Davis] in connection with his performance of services because CNG granted the Allen Option with the intention of securing [Mr. Davis's] participation in the day-to-day management of CNG."[10] The Tax Court credited Jared Davis's testimony that "the Allen Option was granted to induce [Mr. Davis] to stay."[11] It also found that "[t]he option agreement itself provides objective evidence of CNG's intent, as the agreement contains a provision that required [Mr. Davis] to notify CNG in writing if he made a section 83(b) election."[12] The court therefore concluded that Mr. Davis was required to include the value of the shares he received in his gross

---

[9] Davis v. Comm'r, 102 T.C.M. (CCH) 575, 577 (2011).

[10] Id. at 578.

[11] Id.

[12] Id.

9

income in 2004, the year he exercised the Allen Option.

The Tax Court then valued the shares to determine Mr. Davis's tax liability. It agreed with the Commissioner and the CNG taxpayers that the shares' value was established by the Allen Option's cashless exercise provision ($36,962,694). Mr. Davis contended that a thirty-percent discount should have been applied to this valuation to account for the fact that the shares represented a minority interest in a closely-held corporation. The Tax Court rejected this argument, holding that such a discount was inapplicable because the parties had negotiated a formula to determine the shares' value.

Mr. Davis has timely appealed; to ensure consistent treatment of the transaction, the Commissioner timely appealed the decision permitting the CNG taxpayers' deductions.

## II

### DISCUSSION

Mr. Davis urges on appeal that the Tax Court erred in determining that the Allen Option was granted to him in connection with his performance of services and in valuing the shares he received upon the option's exercise. The resolution

10

of the Commissioner's appeal depends on the resolution of Mr. Davis's appeal. We therefore first address the characterization of Mr. Davis's exercise of the Allen Option and then turn to the issue of the CNG taxpayers' deductions.

## A.  Characterization of the Allen Option and its Exercise

"We review the Tax Court's application of the tax code <u>de novo</u> and its findings of fact for clear error."  <u>Campbell v. Comm'r</u>, 658 F.3d 1255, 1258 (11th Cir. 2011).  "[W]hether a transfer is made in connection with the performance of services is essentially a question of fact."  <u>Centel Commc'ns Co. v. Comm'r</u>, 920 F.2d 1335, 1341 (7th Cir. 1990); <u>see also</u> <u>Alves v. Comm'r</u>, 734 F.2d 478, 481 (9th Cir. 1984) ("The Tax Court concluded that Alves obtained the stock 'in connection with the performance of services' as company vice-president.  To the extent that this conclusion is a finding of fact, it is not clearly erroneous.").  Therefore, the Tax Court's determination will not be disturbed unless it is clearly erroneous.  <u>See</u> <u>Comm'r v. Duberstein</u>, 363 U.S. 278, 291, 80 S. Ct. 1190, 1200, 4 L. Ed. 2d 1218 (1960).

### 1.  Application of Section 83

The Tax Court determined that Mr. Davis was granted the Allen Option "in connection with the performance of services," 26 U.S.C. § 83(a), and so his exercise of the option generated ordinary income. Section 83(a) of Title 26 provides that:

> If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of–
>
> (1) the fair market value of such property . . . at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over
>
> (2) the amount (if any) paid for such property, shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable.

In the case of options, "[t]he grant of an option to purchase certain property does not constitute a transfer of such property." 26 C.F.R. § 1.83-3(a)(2). Rather, the transfer occurs when the option is exercised. See id. § 1.83-3(g).

Section 1.83-3(f) of the regulations defines "property transferred in connection with the performance of services" as "[p]roperty transferred to an employee or an independent contractor (or beneficiary thereof) in recognition of the performance of, or the refraining from performance of, services." Id.

12

§ 1.83-3(f).  The recipient of property transferred in connection with the performance of services does not need to be an "employee" of the company transferring the property.  The optionee also can be an officer.  See Alves, 734 F.2d at 480 (involving an optionee who was a vice-president).  Furthermore, "[t]he transfer of property is subject to [26 U.S.C. § 83] whether such transfer is in respect of past, present, or future services."  26 C.F.R. § 1.83-3(f).

We agree with our sister circuits that the language of § 83--"in connection with the performance of services"--encompasses more transfers than just those made as compensation.  See MacNaughton v. United States, 888 F.2d 418, 421 (6th Cir. 1989) (holding that shares in a hospital received by a physician upon his employment by the hospital were transferred in connection with the performance of services even though the "stock was not compensation for services he rendered at the Clinic"); Alves, 734 F.2d at 480-82 (finding that § 83 applied to an option granted to raise capital and "provid[e] the Employee with an additional interest in the Company" (internal quotation marks omitted)).  Indeed, the Tax Court has recognized that, in most cases governed by § 83, "the employers' intent in granting the stock options was to ensure that the employers retained the employment services of their key employees."  Centel Commc'ns Co. v. Comm'r, 92 T.C. 612,

13

632 (1989), aff'd 920 F.3d 1335 (7th Cir. 1990).

Granting an employee, officer or independent contractor an option as an incentive to continue his involvement with the company is a transfer of property in connection with the performance of services. For example, in Bagley v. Commissioner, 85 T.C. 663, 664 (1985), aff'd 806 F.2d 169 (8th Cir. 1986), the taxpayer agreed to work for his employer for five years as a vice-president, and he was granted a stock option allowing him to purchase shares in the employer-company. The Tax Court found that the option was property transferred in connection with the performance of services under § 83. The Tax Court's decision was based on several important facts, including that the taxpayer was referred to as a "'key employee,'" that he gave no consideration for the option other than his promise to be an employee and that the company's intent was to retain his services while incentivizing him to work hard for the business. Id. at 669-70; see also Alves, 734 F.2d at 481 (noting that the parties stipulated that the purpose of granting the option "was to ensure that key personnel would remain with the company").

Here, the Tax Court found that the Allen Option was granted to Mr. Davis

14

"in connection with his performance of services" for CNG.[13]  Mr. Davis arranged for the creation of the Judith Option without Judith's involvement,[14] and all of the parties knew that CNG would immediately cash-out Judith's CNG shares and grant Mr. Davis an option to purchase shares directly from the company.  Despite the form of the transaction, Mr. Davis never intended to exercise the Judith Option to purchase shares from Judith; he intended to purchase shares from CNG.  In reality, CNG, not Judith, always bore the burden of providing Mr. Davis with additional shares when he exercised the option.

The Tax Court's finding that CNG granted Mr. Davis the Allen Option in connection with his performance of services is not clearly erroneous.  The record amply supports the Tax Court's determination.  The Tax Court found that CNG granted Mr. Davis the Allen Option to ensure his continued involvement with the company.  Mr. Davis had conditioned his continued involvement in CNG's management on the receipt of an option to purchase shares to replace those he had to give to Judith.  CNG, believing his threats, granted the Allen Option in order to retain his services.

There is ample evidence in the record to support this finding.  Several CNG

---

[13] Davis, 102 T.C.M. (CCH) at 578.

[14] A.R.E. 2045.

15

taxpayers testified, and evidence demonstrates, that Mr. Davis repeatedly conditioned his continued involvement with CNG on his receipt of an option to preserve or reconstitute his ownership interest percentage. For example, he wrote to Judith: "I can tell you without any reservation that I will not stay at CNG if my stock ownership falls below that which I currently own. . . . I will not work the rest of my life to make everyone in my 'family' rich in return for a small percentage."[15] Mr. Davis's son, Jared, testified that Mr. Davis told him that he wanted to preserve his current level of ownership and, if that was not done, then he would "find another job."[16]

Furthermore, the record makes clear that, if Mr. Davis carried out his threats and stopped his involvement with CNG, the company's survival would be threatened. When asked whether it was important in 2002 to CNG that Mr. Davis maintain his day-to-day management of the company, Jared answered: "Well, without [Mr. Davis], we had no bank credit facility. With no bank credit facility,

---

[15] Id. Ex.44-P at 2.

[16] Id. at 369; see also id. at 371 (Jared Davis's testimony, noting that Mr. Davis told him, "I'm staying when I get the option. If I don't get the option, then I am not going to be full time and we're in default."); id. at 583-84 (David Davis's testimony that CNG gave Mr. Davis the option because Mr. Davis "asked for it and then he demanded it" and that the company felt the option was "the best way to incent [sic] him to stay.").

we had no company."[17]  One of CNG's lenders testified that its credit agreement

with CNG "needed [Mr. Davis] to be there steering the company as a leader."[18]

The lender noted that, were Mr. Davis to leave his leadership role at CNG, then

the lender would have serious doubts about any continued involvement with CNG

because it lacked confidence in the other CNG managers and was "largely

underwriting [Mr. Davis] and his capacity to lead" CNG.[19]

The record supports the conclusion that CNG granted Mr. Davis the Allen

Option for the purpose of retaining his services.  Mr. Davis's sons, Jared and

David, were CNG officers and actively involved in the company's management.

Jared testified that Mr. Davis told him that, if CNG granted him the option, "he

[would have] had a huge incentive to stay, that he would stay around and work"

for CNG.[20]  He also testified that the purpose of the Allen Option was to induce

Mr. Davis "to continue working" at CNG.[21]  Additionally, David testified that he

agreed to grant Mr. Davis the option because "we thought it was the best way to

---

[17]  Id. at 375.

[18]  Id. at 1915.

[19]  Id. at 1916.

[20]  Id. at 370.

[21]  Id. at 386.

17

incent [sic] him to stay and to work and help us grow the company."[22]

Mr. Davis does not dispute that CNG granted the option to him to ensure his continued involvement with the company. Rather, he asserts that the Judith Option, which, after amendment, became the Allen Option, served additional purposes, such as stabilizing control of CNG and resolving family strife. Undoubtedly the Allen Option also provided these benefits. However, the presence of additional benefits or motivating factors does not alter the nature of the option grant. See Alves, 734 F.2d at 480, 483 (finding that § 83 applied to an option grant intended to secure Mr. Alves's continued participation as vice-president, as well as to "raise capital for the Company's initial operations" (internal quotation marks omitted)).

Second, the Tax Court found dispositive the Allen Option's requirement that Mr. Davis notify CNG in writing if he chose to make a § 83(b) election. It is undisputed that the Allen Option agreement was negotiated with the advice of counsel, which suggests that the parties were aware of the significance of a § 83(b) election. The Tax Court found the agreement's express contemplation of a § 83(b) election significant because § 83(b) only applies to income from property

---

[22] Id. at 584.

transferred in connection with the performance of services.

The Tax Court's finding that CNG granted the option to induce Mr. Davis to remain at CNG is based on substantial evidence and therefore not clearly erroneous.

Mr. Davis contends that, because he received the Judith Option from Judith, it could not have been in connection with the performance of services. That claim is unavailing. CNG was the de facto counter-party under the Judith Option. More importantly, CNG granted Mr. Davis the Allen Option. The Supreme Court consistently has held that in analyzing tax cases, substance, not form, governs. See, e.g., Diedrich v. Comm'r, 457 U.S. 191, 196, 102 S. Ct. 2414, 2418, 72 L. Ed. 2d 777 (1982) (discussing cases in which "it was the 'reality,' not the form, of the transaction that governed"). The Allen Option, with its package of substantially different rights than those granted by the Judith Option, is essentially a different option, despite being termed an "amendment" of the Judith Option.

As Mr. Davis admitted and the record makes clear, CNG was always the party actually granting Mr. Davis an option: Judith never intended to keep any CNG shares, so Mr. Davis never could have exercised the Judith Option and

19

purchased shares from Judith.[23]  Mr. Davis and CNG always intended that CNG would redeem Judith's shares immediately and that Mr. Davis ultimately would exercise an option to receive shares directly from CNG.  The record demonstrates that Mr. Davis intentionally structured this transaction to try to avoid an option being granted directly by CNG.  He demanded that CNG pass the option through Judith.  He told CNG that this pass-through arrangement "doesn't mean anything to the company.  The company is still granting me an option.  I am still sticking around.  So it doesn't matter if it flows through Judy.  It is irrelevant to the company."[24]  Mr. Davis also testified that he wanted the option to pass through Judith "[s]o it could never be deemed to be compensatory."[25]

Despite Mr. Davis's efforts, the record amply supports the Tax Court's conclusion:  Although the option passed through Judith, the fact remains that CNG

---

[23]  A.R.E. 435 (Testimony of Jared Davis) (The Judith Option "couldn't be [exercised] because there was a simultaneous closing.  [Mr. Davis] gave the shares to Judy.  Judy sold the shares to us.  And then we gave an option to my dad."); id. at 864 (Testimony of Mr. Davis) (stating that Judith owned no shares before he transferred his to her and that when she had shares she held them for "a minute" and then sold them because "she wanted them redeemed from the company"); id. at 2043-45 (Testimony of Judith's attorney) ("[W]e never worried about the option.  Anything about him getting an option was from the company to him. . . .  [T]he terms and conditions of our option were to be determined not by us but by, it says here by Allen and CNG because we weren't parties to it.  It was all form over substance.").

[24]  Id. at 434.

[25]  Id. at 859.

20

granted the Allen Option to Mr. Davis in connection with his performance of services.

### 2. Section 1041 and the Allen Option

Mr. Davis also urges that, because he convinced CNG first to have Judith grant him an option that CNG would later assume via 'amendment,' his exercise of the option is shielded by 26 U.S.C. § 1041's non-recognition provision and, therefore, the transaction had no tax consequences. We cannot agree.

Section 1041(a) provides in relevant part that "[n]o gain or loss shall be recognized on a transfer of property from an individual to . . . (1) a spouse, or (2) a former spouse, but only if the transfer is incident to the divorce." 26 U.S.C. § 1041(a). Property is transferred incident to divorce if the transfer "occurs within 1 year after the date on which the marriage ceases" or "is related to the cessation of the marriage." Id. § 1041(c). It is undisputed that options are property within the meaning of § 1041 and that the transfer of the Judith Option from Judith to Mr. Davis was incident to their divorce. However, by its own terms, § 1041 applies only to transfers of property between spouses or former spouses incident to divorce proceedings, not to the subsequent disposition of that property by the

21

recipient spouse or former spouse.  The transfer of an option between spouses or former spouses incident to divorce is shielded by § 1041.  See I.R.S. Priv. Ltr. Rul. 201016031 (Apr. 23, 2010) (stating that "section 1041 confers nonrecognition treatment on any gain that A [transferor-spouse] may otherwise realize when A transfers the options to B [transferee-spouse]" (citing Rev. Rul. 2002-22, 2002-1 C.B. 849)).[26]  Thus, when Judith transferred the option to Mr. Davis pursuant to their divorce settlement, neither had to recognize any gain or loss.  However, once this transfer was complete, § 1041 no longer applied.

The transfer of an option is distinct from its exercise.  Mr. Davis asks this court to extend § 1041's protections to his exercise of the Allen Option.  However, § 1041 does not apply to dispositions of assets, whether or not they were previously transferred between spouses incident to divorce.  See, e.g., id. (stating that while the transfer of stock options was shielded by § 1041, their subsequent exercise will create tax consequences for the receiving spouse); I.R.S. Priv. Ltr. Rul. 200646003 (Nov. 17, 2006) (same); see also Berger v. Comm'r, 71 T.C.M. (CCH) 2160, 2162 (1996) (holding that, where husband transferred his interest in

---

[26]  Although the IRS's private letter rulings are not biding precedent, see 26 U.S.C. § 6110(k)(3), we are entitled to give them persuasive authority because they "do reveal the interpretation put upon the statute by the agency charged with the responsibility of administering the revenue laws."  Hanover Bank v. Comm'r, 369 U.S. 672, 687, 82 S. Ct. 1080, 1088 (1962).

the couple's business to wife and wife subsequently sold the business, "the gain on the sale of [the business] is attributable in its entirety" to wife).

Moreover, Mr. Davis's argument does not serve the goals of § 1041. "[T]he rationale behind the adoption of § 1041 [was] to facilitate[] the division of a marital estate incident to divorce without taxation to the spouse who is withdrawing assets from the marital estate." Craven v. United States, 215 F.3d 1201, 1207 (11th Cir. 2000) (internal quotation marks omitted). Here, Mr. Davis exercised the option to reverse the consequences of his divorce with respect to his ownership in CNG.

Had Mr. Davis exercised the Judith Option, he still would have had to recognize as ordinary income the difference, if any, between the fair market value of the shares and the option price, see IRS Pub. 525 (2012), 2012 WL 6737130, because exercise, as distinct from transfer, is not shielded by § 1041. However, Mr. Davis did not (and could not) exercise the Judith Option. Instead, CNG granted him the Allen Option, which he did exercise. The new rights contained in the Allen Option are what he ultimately exercised; he received shares from CNG and did so by using the cashless exercise provision. These rights were not transferred to him by Judith or incident to divorce.

23

**B. Valuation of the CNG Shares Mr. Davis Received**

We review the Tax Court's valuation method de novo and factual determinations about value for clear error. See Estate of Jelke v. Comm'r, 507 F.3d 1317, 1321 (11th Cir. 2007). Section 83(a) requires that the "fair market value" of the property transferred be determined in assessing tax liability. The Tax Court was required to determine the shares' fair market value on the date Mr. Davis exercised the Allen Option. The Supreme Court has noted that "[t]he willing buyer-willing seller test of fair market value is nearly as old as the federal income, estate, and gifts taxes themselves." United States v. Cartwright, 411 U.S. 546, 551, 93 S. Ct. 1713, 1716, 36 L. Ed. 2d 528 (1973). "The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." 26 C.F.R. § 20.2031-1(b).

Section 83(a) requires the inclusion in income of the difference between (1) the property's fair market value at the time the recipient's rights vest, in this case when the option rights were not subject to a substantial risk of forfeiture, and (2) the recipient's basis in the shares received. It is undisputed that Mr. Davis had a

24

zero basis in the shares because he paid nothing for the Allen Option. Therefore, the entire "fair market value" of the shares he received is includable in Mr. Davis's 2004 ordinary income. The Tax Court valued Mr. Davis's shares by using the formula contained in the Allen Option agreement, which also was employed to determine how many shares Mr. Davis had to forego in order to use the cashless exercise provision. We find no error in the Tax Court's approach or valuation.

The Allen Option permitted Mr. Davis either to pay CNG sixteen million dollars to acquire 188.86 shares of stock to replace what he gave to Judith in 2002 or to accept fewer shares in exchange for paying nothing.[27] By using the cashless exercise provision, Mr. Davis relinquished his right to as many shares as were worth sixteen million dollars and received the remainder of the 188.86 shares originally transferred. Upon exercise, he received 131.8055 shares. This arrangement permitted Mr. Davis to capture the shares' appreciation even if he lacked the cash to exercise the option.

Using the figures from the option agreement, the Tax Court concluded that each CNG share was worth $280,433.62[28] on the exercise date. Therefore the

---

[27] A.R.E. 1450.

[28] The Tax Court reached this figure by dividing sixteen million dollars by the 57.0545 shares that Mr. Davis did not receive.

25

value of the 131.8055 shares he received is $36,962,694.  Mr. Davis introduced an expert's valuation of the shares.  However, the Tax Court declined to adopt it, determining that the formula that the parties actually used at Mr. Davis's exercise of the Allen Option was a better starting point for determining value.  Mr. Davis sought to have a thirty-percent lack-of-marketability discount applied to the shares' value.  The Tax Court denied this reduction as inappropriate, given the existence of an agreed-upon formula for determining share value at exercise.

Mr. Davis disagrees.  In his view, the Tax Court erred as a matter of law by failing to reduce the value of the shares from their negotiated price in the Allen Option agreement.  This argument is without merit; there is no authority for the proposition that a lack-of-marketability discount is necessarily required.  "When determining the value of unlisted stock by reference to the value of listed stock, a discount from the listed value is typically warranted in order to reflect the lack of marketability of the unlisted stock."  Estate of Cloutier v. Comm'r, 71 T.C.M. (CCH) 2001, 2003 (1996).  Here, however, CNG shares were not valued with reference to listed securities.  Rather, the Tax Court valued the shares by using Mr. Davis's purchase of them through the Allen Option as the best indicator of their value.  Following this course was in accordance with the Tax Court's

26

precedent that "[i]n determining the value of unlisted stocks, actual sales made in reasonable amounts at arm's length, in the normal course of business within a reasonable time before or after the valuation date are the best criteria of market value." Duncan Indus., Inc. v. Comm'r, 73 T.C. 266, 276 (1979).  Determining the share price by reference to the number of shares that the parties deemed valued at sixteen million dollars when the option was exercised gave the Tax Court a solid, real-world basis for its valuation of the shares purchased.

The Allen Option agreement was an arm's length transaction and employed a formula to calculate share value at any given time based on CNG's performance.[29]  At bottom, the Tax Court credited the parties' own valuation.

The Tax Court also found implausible Mr. Davis's suggestion that a discount was warranted.  It stated:

> If, as [Mr. Davis] contends, the cashless exercise provision establishes only a nominal freely traded value for the shares by failing to account for the stock's lack of marketability, then that would mean CNG accepted stock with a real fair market value of $11.2 million ($16 million discounted by 30 percent) as payment of the $16 million exercise price.  In other words, CNG would have accepted payment of 70 cents on the dollar.[30]

When CNG and Mr. Davis negotiated the cashless exercise provision, they were

---

[29]  A.R.E. Ex.98-P at 2 (tying share value to CNG's twelve-month trailing EBITDA).

[30]  Davis, 102 T.C.M. (CCH) at 579.

aware that CNG was a closely-held corporation whose stock is not traded on an exchange and that the number of shares Mr. Davis could purchase with the option represented a minority stake in the company (indeed, all stakes in CNG are minority).  There is no basis to conclude that these key measures of value were ignored.

The Tax Court did not err in its valuation methodology.  The court was tasked with valuing the shares Mr. Davis received in their cashless sale.  It is reasonable to use the parties' own valuation of the shares on the exercise date in assessing fair market value.  Therefore, the Tax Court's valuation is not clearly erroneous and Mr. Davis should have included $36,962,694 in ordinary income in 2004.

## C.  The CNG Taxpayers' Deductions

Because we hold that CNG granted Mr. Davis the Allen Option in connection with the performance of services and that he should have included the value of the shares he received as ordinary income under § 83(a), we also uphold the CNG taxpayers' deductions.

Under § 83(h), the person or entity that transferred the property in

28

connection with services performed is entitled to a deduction in the amount equal to the amount the recipient is required to recognize under § 83(a), to the extent it reflects reasonable compensation. See 26 U.S.C. § 83(h). The Commissioner does not challenge the reasonableness of the shares as compensation and so the issue of reasonableness is not before us. Therefore, we conclude that the CNG taxpayers' deductions were proper under § 83(h) and affirm the judgment of the Tax Court.

## Conclusion

For the reasons set forth in this opinion, the judgment of the Tax Court is affirmed.

**AFFIRMED**.